**INTERNATIONAL WOOD PRO-CESSORS, a corporation, Plaintiff,**

v.

**POWER DRY, INC., a corporation, Power Dry Patent, Inc., a corporation, Drywood Corporation, a corporation, Compton & Cloer Lumber Company, a corporation, General Wood Processors, Inc., a corporation, European Banking Company Limited, a United Kingdom company, K.N. Hronopoulos, an individual, Delano Compton, an individual, Arthur J. Crowley, an individual, Defendants.**

**Civ. No. 82–2115–14.**

United States District Court, D. South Carolina, Greenville Division.

Aug. 14, 1984.

See also 102 F.R.D. 212.

---

Sedgwick, Detert, Moran & Arnold by Dale E. Fredericks and Rebecca A. Hull, San Francisco, Cal. and Dority & Flint, by Julian W. Dority, Greenville, S.C., for plaintiff.

Sutherland, Asbill & Brennan by John H. Fleming and John A. Chandler, Atlanta, Ga., and Leatherwood, Walker, Todd & Mann by Mark R. Holmes, Greenville, S.C., for defendants Power Dry, Inc., Power Dry Patent, Inc., Compton & Cloer Lumber Co., Gen. Wood Processors, Inc., European Banking Co. Ltd. and Delano Compton.

Arthur J. Crowley P.C. by Arthur J. Crowley, Los Angeles, Cal., and Love, Thornton, Arnold & Thomason by Jennings L. Graves, Jr. and John R. Devlin, Jr., Greenville, S.C., for defendant Arthur J. Crowley.

## OPINION

MacMAHON, District Judge.[*]

All defendants in this action, excluding K.N. Hronopoulos ("Hronopoulos") and Drywood Corporation ("Drywood"), move for judgment n.o.v. or for a new trial, pursuant to Fed.R.Civ.P. 50 and 59, respectively. In addition, plaintiff requests declaratory and injunctive relief in accordance with the verdict.

## I. THE CASE

This case arose from the actions of the parties and other individuals in their attempts to develop and market a new technology for drying wood. A brief outline will provide a helpful context for our discussion of the issues raised by defendants. There was evidence from which the jury could find the following facts.

Before wood can be used in commercial products, such as furniture and flooring, its moisture content must be reduced. This is usually accomplished in conventional wood drying kilns. In conventional kiln drying, wood is stacked in a large, insulated cham-

[*] Of the United States District Court for the Southern District of New York, sitting by designation.

ber, the temperature and humidity within the chamber are controlled, and, by circulating dry, heated air over the wood, "the lumber gets to a certain point and its dry." XX at 6–8.[1]

In 1973, Edward Koppelman applied for a patent on a new method and machine for drying wood through the use of a vacuum chamber and radio frequency waves. A patent was granted in 1976. The patented method of drying wood in radio frequency vacuum kilns ("RFV kilns"), sometimes referred to as the "RFV process," differs from conventional kiln drying in several respects. An RFV kiln is a vacuum chamber in which wood is packed tightly together. Radio frequency waves heat the water in the wood, and, as the temperature rises, it evaporates into the chamber's atmosphere. The kiln's atmosphere, however, maintains a "zero relative humidity level" because of the vacuum. Consequently, the wood dries much faster than in conventional kilns, and this advantage also results in lower energy costs. PX 214; 200. There was evidence, however, that these advantages were offset to some extent by the fact that the RFV process was not successful with many types of wood and wood products.

In 1974, Koppelman issued an exclusive license to use and develop the RFV process to Drywood, a Delaware corporation. Defendant Hronopoulos was an officer, director and sole shareholder of Drywood at the time. Neither Hronopoulos nor Drywood appeared in this action.

In 1978, Koppelman assigned all of his interest in the patent to Hronopoulos. Hronopoulos then gave 50% of his interest in the patent and 10% of his Drywood shares to defendant Arthur J. Crowley ("Crowley"). PX 34; 36.

In February 1979, Hronopoulos also gave Crowley's law firm, Arthur J. Crowley Professional Corporation ("AJCPC"), a security interest in Hronopoulos' 50% patent interest as collateral for legal fees earned by AJCPC, and for future services, totalling $536,000. PX 36.

*The Sublicense*

In its efforts to raise capital, Drywood issued several non-exclusive sublicenses. *See* Exhibit C to PX 13; PX 12; PX 14. On February 4, 1979, Drywood issued the non-exclusive sublicense involved here to John C. Olsen, "or a company or corporation designated by him." PX 53.

On February 26, 1979, Olsen assigned the non-exclusive sublicense to plaintiff International Wood Processors ("IWP"), a California corporation of which he was president and majority shareholder.[2] PX 41; 42. Drywood was notified of the assignment. PX 43. At this time, Olsen was an officer and employee of Drywood.

Sometime in the spring of 1979, Olsen left Drywood's employ, and in August 1979 Drywood executed a "First Amendment to Non-Exclusive Sublicensing Agreement," which "ratified and confirmed in its entirety" the February 4 sublicense given to Olsen and subsequently assigned to IWP. PX 54 ¶ 8.

The parties do not dispute that the IWP sublicense was the most extensive sublicense issued. It permitted the manufacture, lease and sale of an unlimited number of RFV kilns without any territorial restrictions. It also provided for an exchange of technical information and know-how concerning RFV kilns and the RFV process. PX 53 ¶ 7.[3] In addition to various under-

---

1. This citation form refers to the volume (XX) and pages (6–8) of the trial transcript. "PX ___" denotes plaintiff's exhibit.

2. Throughout the relevant period, Olsen was president and majority shareholder of IWP. He was involved in the events as an agent for IWP. Accordingly, for the sake of convenience, we refer hereinafter to IWP with the understanding

that it was Olsen who received communications and acted on IWP's behalf.

3. *See also* PX 170. This is an internal memorandum of defendant European Banking Company, Ltd. The memorandum was written by Neil Balfour, an executive director and member of the board of directors of the bank at the time. He notes in the memorandum that there are "only two [sublicenses] which have commercial-

takings, the sublicensee agreed to pay substantial royalties to Drywood.

### Corporate Restructuring

By late 1979, Drywood and Hronopoulos were the subjects of federal and state investigations concerning illegal securities transactions. Apparently to continue to raise capital, Drywood turned to a joint venture with defendant Compton & Cloer Lumber Company ("C & C"). Defendant Delano Compton ("Compton") was the president, chief operating officer and major shareholder in C & C. Drywood transferred its exclusive license to the joint venture which was called General Wood Processors, Joint Venture ("GWP–J/V"). PX 13.

During this period, defendant European Banking Company, Ltd. ("EBC"), a British corporation, became interested in the commercial potential of the RFV process and began negotiations with Compton, Crowley, Howard Blumenthal (an employee of AJCPC); Drywood, Hronopoulos and others. PX 129. EBC proposed to finance a new corporate structure which would have exclusive rights to the RFV process. *See, e.g.,* PX 170.

The evidence shows that EBC was very concerned about the competitive threat posed by the existence of sublicenses previously issued by Drywood. IWP's sublicense was of particular concern because of its "world wide rights." *See, e.g.,* PX 65; 73. The evidence also shows that each of the defendants knew, through meetings, telexes and letters, that EBC would not finance the proposed restructuring unless the outstanding sublicenses were either reacquired or cancelled. *See, e.g.,* PX 65; 73; 240 at No. 22; 31; 32; 243; 277; 278; XIX at 30.

The evidence also shows that each of the defendants, in varying degrees, knowingly participated in a common plan to effect EBC's scheme.

For example, in January 1981, a two-day meeting concerning the terms of EBC's proposed financing was held in New York City. Crowley, Blumenthal, Hronopoulos, Compton and Neil Balfour (EBC's representative) participated in meetings held on the first day. There was evidence that discussions at these meetings included the existence, scope, competitive threat and methods of cancelling the IWP license. *E.g.,* XIX at 30.

On March 12, 1981, AJCPC, on behalf of Drywood, notified IWP that Drywood, through GWP–J/V, "[stood] ready to deliver the subatmospheric chambers," a precondition to IWP's performance. AJCPC further notified IWP that it should contact Compton concerning the sublicense and that "all the time periods referred to in ... the sublicense and its amendments are hereby activated...." PX 88. Compton testified, however, that GWP–J/V was not ready at that time to deliver any chambers to IWP. XVI at 23.

On April 6, 1981, IWP notified Compton and Drywood that it had essentially secured financing and requested the technical information necessary to obtain financing and construct RFV kilns. PX 30; 93; 99; 102. Neither Drywood nor Compton replied. XVI at 23–24; XIX at 40. IWP also wrote to EBC expressing its willingness to discuss selling its sublicense. PX 100.

In May 1981, EBC financed a new corporate structure which controlled both the patent and exclusive licensing rights to the RFV process. GWP–J/V transferred its exclusive license to defendant Power Dry, Inc. ("PDI"). PDI then granted a purported exclusive license,[4] limited to the United

---

ization potential." One of these was controlled by defendants Drywood and Compton & Cloer Lumber Company. The other sublicense which was "of interest" to EBC was plaintiff's. The memorandum further notes: "It is possible that these two sub-licenses could be brought within the control of a single, new, corporate entity (to avoid competition between the two sublicenses)." *Id.* ¶ d.

4. Strictly speaking, this license could have been "exclusive" only if plaintiff IWP's sublicense did not exist, because IWP's sublicense was not subject to any territorial restrictions and, therefore, could compete directly with GWP, Inc. in the United States.

States, to defendant General Wood Processors, Inc. ("GWP, Inc."). Hronopoulos transferred his remaining 50% interest in the patent, which was subject to AJCPC's security interest, to defendant Power Dry Patent, Inc. ("PDP") and was retained by PDI as a consultant. *See* PX 101; *see also* PX 158.

In return for $500,000 paid by EBC to his professional corporation, Crowley released the pledge—AJCPC's security interest in Hronopoulos' 50% patent interest. In addition, Crowley transferred 1% of his personal 50% interest in the patent to PDP. He retained his remaining personal 49% interest and the royalty rights pertaining to that interest. PX 34; 35; 91; 97. Compton received considerable stock in PDI and was made chairman of the board. *See* XVI at 24.

In November 1981, after learning that Drywood's rights and obligations under the exclusive license had been assigned to PDI, IWP notified PDI that it had financing available, requested technical information and stated that it was negotiating with contractors to build RFV kilns. *See* PX 104; 105.

Finally, on January 23, 1982, PDI, PDP and GWP, Inc., responding for the first time to IWP's request for technical information etc., informed IWP that its sublicense was terminated. PX 5. IWP then began this litigation in the Central District of California, but the case was transferred to this district.

## II. THE CLAIMS

The jury was charged on the following claims: (1) that defendants conspired to restrain trade in the United States market for the RFV process and kilns by excluding plaintiff as a competitor, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) that Drywood and PDI breached the sublicense by failing to provide techni-

cal information and know-how, in violation of California contract law; and (3) that each of the other defendants intentionally induced the breach, also in violation of California law.

In its fourth claim, plaintiff seeks a declaratory judgment that the sublicense is a valid contract and that plaintiff is entitled to current and future technical information and know-how received by Drywood or PDI. 28 U.S.C. § 2201.

In its fifth claim, plaintiff seeks an order directing Drywood and PDI to provide such information and know-how. 15 U.S.C. § 26.

Defendants counterclaim for a declaratory judgment that plaintiff has no right under its sublicense.[5]

After hearing live or deposition testimony from over 20 witnesses and considering over 240 exhibits during a three and one-half week trial, the jury returned a general verdict, accompanied by answers to special interrogatories, for plaintiff and against all defendants on all three claims submitted to it. The jury awarded plaintiff $900,000 on the antitrust claim; $200,000 on the breach of contract claim; $200,000 on the inducement of breach claim; and assessed $70,000 in punitive damages against EBC, Compton and Crowley. The Clerk entered judgment for $2,700,000 against all defendants, and judgment for $70,000 was entered against the three defendants found liable for punitive damages.

Defendants base their motions on a host of contentions. We address those arguably meritorious.

## III. THE ANTITRUST VERDICT

■ On a motion for judgment n.o.v., we must refrain from weighing the credibility of the witnesses, view all the evidence in the light most favorable to the non-moving

---

5. PDI also counterclaimed that plaintiff had tortiously interfered with its business relationship and violated the Lanham Act, 15 U.S.C. § 1125. Plaintiff moved to dismiss these claims and defendants did not object. *See* Power Dry, Inc. et al. Brief in Response to Plaintiff's Motion to Dismiss Counterclaims at 2–3. Accordingly, PDI et al.'s first and second counterclaims are dismissed. We discuss PDI et al.'s remaining counterclaim for declaratory relief, essentially the reverse of plaintiff's claim for such relief, in Part X, *infra*.

party, and give that party the benefit of all reasonable inferences which may be drawn from the evidence. *Continental Ore Co. v. Union Carbon & Carbide Corp.,* 370 U.S. 690, 696 n. 6, 82 S.Ct. 1404, 1409 n. 6, 8 L.Ed.2d 777 (1962) (same standard in antitrust treble damage suits); *Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir.1970). With these requirements firmly in mind, "[i]f the evidence is of such quality and weight that reasonable men might reach different conclusions in the exercise of impartial judgment, a motion for a directed verdict [or judgment n.o.v.] should be denied." *Harrington v. United States,* 504 F.2d 1306, 1312 (1st Cir.1974); *Simblest v. Maynard, supra, id.* (evidence must be such that there could be only one conclusion).

In their motions for judgment n.o.v., defendants principally contend that (1) their activities are exempt from the antitrust laws because of their patent rights; (2) there is insufficient evidence of conspiracy or membership in the conspiracy; (3) there is insufficient evidence of an unreasonable restraint of trade; and (4) there is insufficient evidence of the fact of injury or the amount of damages.

## A. PATENT RIGHTS

Defendants argue that the termination of plaintiff's sublicense is exempt from antitrust scrutiny under the patent laws. Defendants cite several cases for the proposition that a patentee's *refusal to license* is exempt, under some circumstances, from the antitrust laws, *e.g., United States v. Westinghouse Electric Corp.,* 648 F.2d 642, 647 (9th Cir.1981). However, this argument, and their cases, are inapposite because the issue here is not the failure to license; rather, it is the breach and termination of a license, already issued by the patentee, in the context of a larger conspiracy to exclude a competitor in restraint of trade.

Defendants have cited no cases which support the proposition that a patentee's breach or termination of a license in such a context is not subject to the stric-

tures of the antitrust laws. Indeed, the cases are to the contrary. For example, in *Mannington Mills, Inc. v. Congoleum Industries, Inc.,* 610 F.2d 1059 (3d Cir.1979), the court squarely held "that a patentee's termination of a licensee, in concert with competing licenses, is not entitled to an antitrust exemption." *Id.* at 1073. Where patent policy allegedly conflicts with the goals of the antitrust laws, the courts have not prescribed immutable rules. Rather, an interest analysis and balancing test are appropriate in resolving the tension. L. Sullivan, Antitrust §§ 177 at 505–06; 184 at 532–34 (1977) (patent and antitrust interests must be balanced based on specific facts of each case).

In light of the evidence in this case, we find that the clear detriment to competition outweighs the attenuated patent arguments asserted by defendants, some of whom had no patent rights at any time.

## B. EVIDENCE OF CONSPIRACY

Defendants contend that there was insufficient evidence from which a jury could conclude that defendants conspired to exclude plaintiff as a competitor. We note again that on this motion plaintiff is entitled to "the benefit of all inferences which the evidence fairly supports even though contrary inferences might reasonably be drawn." *Michelman v. Clark-Schwebel Fiber Glass Corp.,* 534 F.2d 1036, 1042 (2d Cir.1976).

It is axiomatic that conspiracy need not be proved, and rarely is proved, by direct evidence of unlawful agreement. Conspiracy can be established, however, by circumstances and inferences which "[a]t a minimum ... suggest a commitment to a common end." *Michelman v. Clark-Schwebel Fiber Glass Corp., supra,* 534 F.2d at 1043; *American Tobacco Co. v. United States,* 328 U.S. 781, 809–10, 66 S.Ct. 1125, 1138–39, 90 L.Ed. 1575 (1946) ("unity of purpose or a common design or understanding").

Moreover, it is hornbook law that to be a member of a conspiracy, the conspira-

tor need not declare his assent to the conspiracy or its purpose. It is enough that, with knowledge of the unlawful plan, the defendant encouraged, advised or assisted in furthering the plan. Furthermore, "[a]cts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet if they are part of the sum of acts which are relied upon to effectuate the conspiracy which the [antitrust] statute forbids, they come within its prohibition." *American Tobacco Co. v. United States, supra,* 328 U.S. at 809, 66 S.Ct. at 1138.

In their joint brief in support of their motions, PDI, PDP, GWP, Inc., EBC and Compton, despite over three weeks of trial and the admission of over 240 documents, offer one sentence supporting their statement that the evidence is insufficient to establish conspiracy. They state: "As discussed above, the evidence establishes that no party other than Power Dry acted to give Olsen [IWP] notice of the invalidity of his license." Defendants' reference to the discussion "above" is quite unilluminating, and they do not elaborate in their reply brief.

■ Nevertheless, interpolating defendants' laconic arguments, we understand their contention to be that PDI acted unilaterally in terminating plaintiff's license and, therefore, there can be no illegal conspiracy. This argument misses the mark. Plaintiff alleged, and presented evidence from which a jury could reasonably conclude, that defendants were involved in an ongoing conspiracy to restrain trade unreasonably by excluding plaintiff from the market. The termination letter was simply the culmination of the conspiracy which was also effectuated by (1) withholding technical information and know-how, and (2) facilitating and financing a corporate restructuring with knowledge that its essential purpose was to secure a monopoly, by excluding plaintiff in the market for the RFV process.

There was more than sufficient evidence from which a jury could conclude that defendants had a "unity of purpose" or "common understanding" that plaintiff be ex-cluded as a competitor. Plaintiff had the only outstanding sublicense which was essentially unlimited in scope and not subject to any territorial restrictions. Other potentially competing sublicenses, of more limited scope, had either been acquired, terminated or lapsed. There was also substantial evidence that EBC had made it clear to defendants that it would not finance RFV development and marketing unless the restructured corporation held a majority of the patent rights and all license rights. *E.g.,* VII at 43–44; PX 65. Evidence also showed that defendants knew of EBC's conditions and assisted in furthering a common plan to remove outstanding sublicenses as a competitive threat. Moreover, the evidence showed that all defendants sought, and benefited or stood to benefit from, an EBC financing and from a monopoly position in the RFV process. *See* PX 158; 240.

As a result of the financing, for example, Crowley's professional corporation, AJCPC, received $500,000. Compton became chairman of the board of PDI, as well as an officer. He also received stock in the new corporation. The reorganization financed by EBC significantly improved the likelihood that Crowley's royalties would increase and that Compton's substantial investment of time and money in the RFV process would finally become profitable.

Letters, telexes and memoranda, generally cross-copied, which referred directly or obliquely to the existence, necessity and methods of terminating plaintiff's sublicense were exchanged among defendants and their agents. Meetings were held in October 1980 and January 1981. The evidence supported a conclusion that the sublicenses were discussed and that methods of terminating plaintiff's sublicenses were discussed in order to assure PDI, PDP and GWP, Inc. a monopoly position in the RFV process.

Following the January meeting, Drywood, through AJCPC, notified plaintiff that all time periods in its sublicense were "activated," and plaintiff was further informed that no exceptions would be made.

Based on a provision in its sublicense, PX 53 ¶ 7, plaintiff requested essential technical information concerning RFV kilns. It also informed defendants that, upon receipt of the information, it could assure financing and perform under the contract. *E.g.*, PX 93. Defendants ignored plaintiff's requests. After learning that plaintiff was actively marketing RFV kilns, PDI, PDP and GWP, Inc. terminated plaintiff's sublicense. PX 5.

A jury could reasonably conclude from the evidence that each of the defendants had not only a motive but also a "unity of purpose" to exclude plaintiff as a competitor of PDI, PDP and GWP, Inc. Moreover, the jury was entitled to find that defendants knowingly assented and acted to further the conspiracy.

Defendants' arguments to the contrary simply point to conflicting evidence and inferences. However, where the evidence is merely conflicting and where, as here, issues of credibility and weight abound, the court cannot simply substitute its own determination for that of the jury's. "[I]t is the function of the jury as the traditional finder of facts, and not the court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *Boeing Co. v. Shipman*, 411 F.2d 365, 375 (5th Cir.1969) (*en banc*).

Thus, having carefully reviewed all the evidence, including but not limited to that which is outlined above and in Part I, *supra*, we cannot say that

(1) there is such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant[s] that reasonable and fair minded men could not arrive at a verdict against [them].

*Mallis v. Bankers Trust Co.*, 717 F.2d 683, 688 (2d Cir.1983).

## C. UNREASONABLE RESTRAINT OF TRADE

Defendants contend that their conduct did not unreasonably restrain trade because "there was clear evidence of pro-competitive effects in eliminating Olsen [IWP]...." Power Dry, Inc. et al. Supplemental Brief in Support of Post-Trial Motions at 18. As examples of the "pro-competitive" effects of "eliminating" IWP, defendants reason that (1) successful marketing of the RFV process required "one substantial and credible voice" and "unity of effort;" (2) "Olsen's [IWP's] presence in the market ... [exacerbated] the unsavory reputation for the process which Power Dry was seeking to overcome;" and (3) "IWP's allegedly inept technical and marketing skills would damage the image of the RFV drying process." Power Dry, Inc. et al. Supplemental Brief, *supra*, at 17–18.

The courts have long applied a "rule of reason" to determine whether a particular restraint, which is not illegal *per se*, unreasonably restrains trade and thus violates the Sherman Act. *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *see also Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) (hereinafter *"Sylvania"*). This rule has recently been applied in cases, such as this one, which are not easily classified because they involve aspects of both vertical and horizontal restraints. *E.g.*, *Copy-Data Systems, Inc. v. Toshiba America, Inc.*, 663 F.2d 405 (2d Cir.1981); *Abadir & Co. v. First Mississippi Corp.*, 651 F.2d 422 (5th Cir.1981); *Donald B. Rice Tire Co. v. Michelin Tire Corp.*, 638 F.2d 15 (4th Cir.), *cert. denied*, 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981). Under the "rule of reason" analysis, the anti-competitive and pro-competitive effects of the restraint must be considered. *Sylvania, supra.*

A further distinction has been drawn between the effects of restrictive conduct on intrabrand competition and interbrand competition. Intrabrand competition is competition among those who sell the product of a particular manufacturer, *Sylvania, supra*, 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19, while interbrand competition is "competition among the manufac-

turers of the same generic product." *Id.* The primary concern of antitrust law is "interbrand competition, not intrabrand competition." *Copy-Data Systems, Inc. v. Toshiba America, Inc.,* *supra,* 663 F.2d at 411.

■ We now turn to defendants' asserted pro-competitive effects. The thrust of their argument is that the elimination of plaintiff as a seller of RFV kilns better enables defendants to compete head-on with sellers of conventional kilns, thereby enhancing interbrand competition in the market for all wood drying kilns. Defendants are fighting the wrong battle, however, because the jury reasonably found that the relevant product market is the market for RFV kilns and not all wood drying kilns.[6] In this market, RFV kilns are the "generic product," and there were only two "brands" or manufacturers of RFV kilns—defendants and plaintiff. By eliminating plaintiff, therefore, defendants eliminated all interbrand competition in the market for RFV kilns.

In this context, the jury was entitled to find, indeed, it could hardly find otherwise, that defendants' elimination of their only competitor in the relevant market was an unreasonable restraint of trade. *See Sylvania, supra,* 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19 ("extreme example of defi-

ciency in interbrand competition is ... where there is only one manufacturer").

## D. FACT OF INJURY AND AMOUNT OF DAMAGES

■ To sustain an antitrust verdict under § 1 of the Sherman Act, the evidence must be sufficient to find both (1) the fact of injury to plaintiff's business or property and (2) the amount of damages sustained by plaintiff. *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931); *Wilder Enterprises, Inc. v. Allied Artists Pictures Corp.,* 632 F.2d 1135, 1139 n. 1 (4th Cir.1980); *Paschall v. Kansas City Star Co.,* 605 F.2d 403, 407–08 (8th Cir.1979); *see also* L. Sullivan, Antitrust, *supra,* § 251 at 785; Note, Private Treble Damage Antitrust Suits: Measure of Damages for Destruction of All or a Part of a Business, 80 Harv.L.Rev. 1566, 1572–1574 (1967).

However, "there is a clear distinction between the measure of proof necessary to establish the fact that [plaintiff] had sustained some damage and the measure of proof necessary to enable the jury to fix the amount." *Story Parchment Co. v. Paterson Parchment Paper Co., supra, id.* One authoritative commentator has summarized this distinction as follows:

---

**6.** An effective rule of reason analysis requires an examination of the relevant market. *E.g., Donald B. Rice Tire Co. v. Michelin Tire Corp.,* 483 F.Supp. 750, 755 (D.Md.), *aff'd,* 638 F.2d 15 (4th Cir.), *cert. denied,* 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981). The relevant geographic market—the United States—is not disputed. Concerning the determination of the relevant product market, "no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purpose make up" a relevant product market. *United States v. E.I. duPont de Nemours,* 351 U.S. 377, 394–95, 76 S.Ct. 994, 1006–07, 100 L.Ed. 1264 (1956); *see also* R.A. Posner, Antitrust § 437 (1974) (regarding "cross-elasticity of demand" as parallel concept in economics).

There was ample evidence to support the jury's conclusion, *see* Verdict Form, Interrogatory No. 10, that wood drying through the RFV process constituted a relevant market. The jury heard expert testimony concerning the relevant

product market from those knowledgeable in the business, as well as from an expert in economics, Ronald Wilder. *See* XIV at 17–21. The evidence showed that RFV kiln drying differed from conventional kiln drying in several significant respects affecting interchangeability: speed, cost, the types of wood susceptible to RFV drying, and the types of wood products amenable to the process. Moreover, defendants' own evidence showed that they did not consider the price charged for conventional kilns when setting their price for RFV kilns. IX at 99–102. This evidence corroborates Wilder's opinion that the cross-elasticity of demand between RFV kilns and conventional kilns was "very low." XIV at 20. Thus, we find the evidence of an absence of reasonable interchangeability between RFV and conventional kilns sufficient to support the jury's finding that the RFV process constituted a relevant product market.

Proof that injury occurred—proof of the fact of damage, as the process is sometimes called—is usually straightforward. There has been no tendency to lighten plaintiff's burden; the preponderance of evidence rule applies in unqualified form. Proof of an overcharge, *an exclusion from a market, a termination* or a loss of suppliers or customers are illustrative of the kinds of things that serve to meet the burden. Plaintiff's burden of proof as to the amount of damages has, however, been ameliorated considerably. The court or jury is entitled to make a "just and reasonable estimate" of the damages from "relevant data" which may include the "probable and inferential, as well as direct and positive proof."

L. Sullivan, Antitrust, *supra, id.* (emphasis added, footnotes omitted). *See also, Bonjorno v. Kaiser Aluminum & Chemical Corp.*, 518 F.Supp. 102, 114 (E.D.Pa.1981) (once fact of injury has been proven, the burden on the antitrust plaintiff to establish the precise amount of damages is not as great as in other kinds of lawsuits).

Thus, where, as here, the evidence is sufficient to find that the aim and effect of the conspiracy were to exclude plaintiff as a competitor in the market, the jury was entitled to find that plaintiff was injured in fact. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114, 89 S.Ct. 1562, 1541, 23 L.Ed.2d 129 (1969) (even partial exclusion sufficient to find injury in fact). Moreover, there was ample evidence of injury in fact. For example, plaintiff's economics expert testified:

Once [plaintiff] received the letter [PX 5] and once customers and potential financiers knew that the sublicense was in doubt or terminated or whatever, [plaintiff's] ability to compete in the market was effectively ended.

XIV at 41–42.

Defendants' argument is premised on the assertion that even if plaintiff's sublicense had not been terminated or technical information withheld, plaintiff would not have marketed RFV kilns because of its alleged lack of financing, technical and managerial experience. This argument is unpersuasive.

Plaintiff presented evidence that it had financing, and that it had launched a serious marketing campaign with some success. Furthermore, in addition to plaintiff's president's (Olsen's) own experience in the RFV process while employed by Drywood, plaintiff had engaged an experienced businessman and manager, familiar with the RFV process, as an advisor and sales representative.

Thus, at most, the record presents conflicting evidence which it was the jury's province as fact-finder to weigh and accept or reject. We certainly cannot say that the *only* reasonable conclusion to be drawn from the evidence is that plaintiff could not have competed even if there had been no conspiracy. "[I]t is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4." *Zenith Radio Corp. v. Hazeltine Research, Inc., supra*, 395 U.S. at 114 n. 9, 89 S.Ct. at 1571 n. 9; *Bonjorno v. Kaiser Aluminum & Chemical Corp., supra*, 518 F.Supp. at 110.

Turning to the question of the amount of damages, we find the Supreme Court's instructions in *Zenith Radio Corp.*, also a market exclusion case, to be particularly apt:

Trial and appellate courts alike must also observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts. The Court has repeatedly held that in the absence of more precise proof, the factfinder may "conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the de-

cline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs." *Bigelow v. RKO Pictures, Inc., supra,* [327 U.S. 251] at 264, [66 S.Ct. 574, at 579, 90 L.Ed. 652] See also *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 377–379, [47 S.Ct. 400, 404–405, 71 L.Ed. 684] (1927); *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 561–566, [51 S.Ct. 248, 250–51, 75 L.Ed. 544] (1931).

*Zenith Radio Corp., supra,* 395 U.S. at 123–24, 89 S.Ct. at 1576–77.

Defendants contend that plaintiff's proof of the amount of damages is speculative. They do not argue that the damages are excessive; rather, their position is that there was simply no basis for awarding any damages. The gist of their argument is that awarding lost future profits to a business with no actual sales record necessarily requires a leap into the speculative. In support of their argument, defendants attack the assumptions and conclusions of plaintiff's expert on damages.

■■■ We start with the premise that "it is as unlawful to prevent a person from engaging in business as it is to drive a person out of business." *Thomsen v. Union Castle Mail S.S. Co.,* 166 F. 251, 253 (2d Cir.1908). An antitrust plaintiff in a market exclusion case is not precluded from proving damages as lost profits simply because its nascent business has shown no past profits. *See H & B Equipment Co. v. International Harvester Co.,* 577 F.2d 239 (5th Cir.1978); *see also, Hayes v. Solomon,* 597 F.2d 958, 973 (5th Cir.1979) (plaintiff can sue for harm to unestablished business if he intended to start business and was prepared to do so), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980); *Martin v. Phillips Petroleum Co.,* 365 F.2d 629, 633 (5th Cir.), *cert. denied,* 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966); *Triangle Conduit & Cable Co. v. National Elec. Prods. Corp.,* 152 F.2d 398, 399 (3d Cir.1945); *Fleer Corp. v. Topps Chewing Gum, Inc.,* 415 F.Supp.

176, 181 (E.D.Pa.1976) (allegation of intent and preparedness to engage in business is sufficient to give plaintiff standing under § 4 to sue for harm to the nascent venture); *see generally,* 2 P. Areeda & D. Turner, Antitrust Law ¶ 335 at 174–75 (1978); Proof of Damages for Terminated or Precluded Plaintiffs, 49 Antitrust L.J. 153 (1980).

■■■ There was more than sufficient evidence that plaintiff intended, was prepared to, and, in fact, attempted to compete. For example, there was evidence that plaintiff had financing arrangements, had negotiated for the construction of RFV kilns, had a knowledgeable manager and businessman as an advisor and sales representative, had printed advertising brochures, had attempted to put together sales seminars, and had contacted potential customers with some success. In addition, of course, the jury was entitled to consider the evidence that defendants themselves perceived plaintiff to be a competitor. Thus, the fact that plaintiff could not point to past profits does not render speculative the damages award based on a projection of future lost profits.

### Evidence of Damages

■■■ It is well established that an antitrust plaintiff may recover lost future profits. *E.g., Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16, 22–25 (5th Cir. 1974); *see also,* Annot., Measure and Elements of Damages under 15 U.S.C. § 15, 16 A.L.R.Fed. 14, § 17 (1973).

■■■ Plaintiff sought to prove lost future profits through the testimony of an expert in accounting and financial forecasting. The use of expert testimony, sales projections and financial forecasts are accepted methods of proving antitrust damages, particularly when defendant's wrongful conduct and its own dismal business performance make proof by other means virtually impossible. *See Delaware Valley Marine Supply Co. v. American Tobacco Co.,* 184 F.Supp. 440, 443 (E.D.Pa.1960); *Wm. Goldman Theatres, Inc. v. Loew's, Inc.,* 69 F.Supp. 103 (E.D.Pa.), *aff'd,* 164

F.2d 1021 (3d Cir.), *cert. denied,* 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1948); *see also* Annot., *supra,* 16 A.L.R.Fed. at 51–55; 16N von Kalinowski, Antitrust Laws and Trade Regulation § 115–03[3] at 115–79 (1974); Models for Assessing Lost Profits to Antitrust Plaintiffs, 60 Minn.L.Rev. 1233 (1975).

▮ In assessing the expert's testimony, " 'juries are allowed to act upon probable and inferential, as well as direct and positive proof.' " *Story Parchment Co. v. Paterson Parchment Paper Co., supra,* 282 U.S. at 564, 51 S.Ct. at 251; *Zenith Radio Corp. v. Hazeltine Research, Inc., supra,* 395 U.S. at 124, 89 S.Ct. at 1577. Moreover, as the Fifth Circuit has noted, "the expert on damages need not be armed on the right hand with a slide rule, on the left hand with a computer. He is allowed some economic imagination so long as it does not become fantasy." *Terrell v. Household Goods Carriers' Bureau, supra,* 494 F.2d at 25. The essential requirement is that the expert's testimony be based on the available data which provides a rational foundation for a qualified expert's logical assumptions and inferences. *See id.* at 24; L. Sullivan, Antitrust, *supra,* at 787.

▮ Obviously, an expert's assumptions, if within the realm of reason, need not be the only possible set of assumptions based on the data. It is sufficient if the expert presents one set of logical relations rationally premised on evidence which the jury, as ultimate fact-finder, might credit even though disputed. *See, e.g., Hobart Bros. Co. v. Malcolm T. Gilliland, Inc.,* 471 F.2d 894, 903 (5th Cir.), *cert. denied,* 412 U.S. 923, 93 S.Ct. 2736, 37 L.Ed.2d 150 (1973); *see also, Eastman Kodak Co. v. Southern Photo Material Co.,* 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927) (defendant cannot complain that antitrust damages "cannot be measured with the same exactness and precision" as in absence of violation).

▮ Plaintiff's proof of the amount of damages largely consists of the testimony and financial projections of John Markel, a certified public accountant trained in marketing and financial forecasting. Markel developed two comprehensive financial forecasts which are summarized in PX 296 and 297. These forecasts, or projections, clearly show his assumptions and method of computing lost future profits. Markel testified that he had consulted individuals experienced in the field of RFV wood drying and had examined the relevant literature.

The crucial assumptions in his projections were the price of each RFV kiln and the average number of machines sold each year. In the course of painstaking direct examination and thorough cross-examination, Markel testified to the facts and sources underlying his assumptions. He explained clearly the logic employed in arriving at his estimate of the present value of lost profits.

In establishing a sales price, Markel considered prices charged by defendants, costs, and estimates of other knowledgeable persons, as well as plaintiff's proposed price. VI at 14. Markel then applied a payback and capital budgeting analysis, which he explained to the jury, and determined that from both the buyer's and seller's standpoint the price per unit was reasonable. VI at 13.

The reasonableness of Markel's projection of the average number of sales per year presents a closer question. But we cannot say that a reasonable jury could not accept plaintiff's expert's projection of the average number of annual sales, giving plaintiff's evidence "the advantage of every fair and reasonable intendment that the evidence can justify." *Continental Ore Co. v. Union Carbon & Carbide Corp., supra,* 370 U.S. at 696 n. 6, 82 S.Ct. at 1409 n. 6.

Markel testified that he based this projection on a review of the sublicense and conversations with at least five different, knowledgeable sources. VI at 19–20. Markel himself was trained in marketing and calculating financial forecasts for businesses. While Markel's sales projections

may appear somewhat optimistic, we cannot say as a matter of law that their foundation is inadequate or that they fall beyond the pale of reason. Moreover, it is obvious that the jury was not unduly mesmerized by Markel's testimony. The jury returned verdicts for substantially less than Markel's projections, thus indicating that it fully performed its role as independent fact-finder.[7]

The evidence shows that defendants sold at least ten machines in approximately two or three years, despite their own admission that their companies were poorly managed. XVI at 25. There was also evidence that a former sublicensee had thirty RFV kilns. XVI at 27. Defendants contend that they did not profit from these sales. This contention was never documented as to individual sales, and, in any event, is not dispositive. The jury might well have concluded, based on the evidence, that defendants' net losses were due to their admittedly poor management.

It would also be contrary to logic and justice if a defendant found liable for exclusionary conduct could point to its own lackluster market performance to bar plaintiff's recovery as a matter of law. At most, defendants' inconclusive evidence of net loss was simply one factor among many for the jury to consider.

It should also be noted that the thrust of defendants' damages defense at trial was that there was simply no injury in fact. *E.g.*, VI at 21. They offered no alternative

methodology or calculations. Rather, they were content to rely on discrediting plaintiff's expert through cross-examination. As one court noted, however

> Where the defendant adduces no evidence of alternative methodologies or statistics, but merely criticizes those employed by the plaintiff's expert, acceptance of the projections of plaintiff's expert is appropriate, since they do have a rational basis. *See Taxi Weekly, Inc. v. Metropolitan Taxicab Board of Trade, Inc.*, 539 F.2d 907, 914–15 (2d Cir.1976).

*Eiberger v. Sony Corp. of America,* 459 F.Supp. 1276, 1286 (S.D.N.Y.1978).

In sum, recalling that antitrust damages "are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts," *Zenith Radio Corp., supra,* 395 U.S. at 123, 89 S.Ct. at 1576, we find that damages awarded were supported by the evidence and within the bounds of reason. *See Litton Systems Inc. v. American Telephone & Telegraph Co.,* 700 F.2d 785 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 984, 79 L.Ed.2d 220 (1983).

## IV. BREACH OF CONTRACT

The jury found Drywood and PDI (as assignee) liable for breach of contract by failing to give plaintiff updated technical information and know-how concerning RFV kiln drying, as required by ¶ 7A of the sublicense.[8] Defendants contend, however,

---

**7.** We note here that the jury was specifically instructed to give careful scrutiny to expert testimony:

> Now, the Rules of Evidence ordinarily do not permit witnesses to testify as to opinions or conclusions. An exception to this rule exists as to those whom we call expert witnesses. Witnesses who by education and experience have become expert in some art, science, profession or calling, may state an opinion as to the relevant and material matter in which they profess to be an expert. And they may also state their reasons for the opinion.
>
> You should consider each expert opinion received in evidence in this case, and give it such weight as you may think it deserves. If you should decide that the opinion of an expert witness is not based upon sufficient education and experience, or if you should con-

clude that the reasons given in support of the opinion are not sound, or that the opinion is not supported by the evidence in the case, or is outweighed by other evidence, you may disregard the opinion entirely.

> In short, as I told you as the experts were testifying, you're not bound by their opinions. XIII at 9.

**8.** Paragraph 7, in its entirety, provides:

> 7. TRADE SECRETS & KNOW–HOW
>
> A. Drywood shall make available, for the use of Sublicensee, all trade secrets and know-how that Drywood has relating to the construction and operation of the Facility and the apparatus and process encompassed within said patent insofar as they relate solely to the drying, seasoning and treating of lumber.
>
> B. Sublicensee shall forthwith give full information of, and convey to Drywood, any

that their performance was excused because plaintiff failed to comply with an alleged condition precedent, *i.e.*, that it provide defendants with "suitable documentation to Drywood's satisfaction irrevocably guaranteeing financing for the construction of one unit" (hereinafter "financial documents"). PX 53 ¶ 5A.[9]

The contract provides that plaintiff is to present financial documents "within sixty (60) days from the date of the issuance of this sublicense ...." PX 53 ¶ 5A. The sublicense was issued on February 4, 1979. It is undisputed that plaintiff did not furnish financial documents within sixty days. Nevertheless, defendants gave plaintiff no notice to cure, as required by the contract. *See* PX 53 ¶ 12A.[10] Nor did defendants notify plaintiff that the contract was terminated. In fact, over six months later, in August 1979, Drywood executed an amendment to the sublicense. PX 54. The amendment acknowledged "substantially changed circumstances," "ratified and confirmed [the sublicense] in its entirety," made no reference to the sixty-day period, and specifically made plaintiff's performance contingent on defendants' performance.[11] See PX 54 ¶ 1.

■■■■ Defendants' execution of the sublicense was a knowing waiver of plaintiff's failure to provide financial documentation, originally required under the sublicense, within sixty days of February 4, 1979. *See* E.A. Farnsworth, Contracts § 8.5 (1982). Furthermore, for nearly three years, plaintiff reasonably relied, to its detriment and with defendants' knowledge, on the promises made by Drywood in the sublicense and its amendment. Defendants are therefore estopped from denying the validity of the sublicense at this late stage. *See Longshore v. County of Ventura*, 25 Cal.3d 14, 157 Cal.Rptr. 706, 598 P.2d 866, 874 (1979); Restatement (Second) of Contracts § 90 comment a (1979).

■■■■ Moreover, even assuming plaintiff was required to present financial documents within a reasonable time after defendants complied with one of the condi-

---

and all trade secrets and know-how acquired by Sublicensee relating to the construction and operation of the Facility and the apparatus and process encompassed within said patent.
PX 53.

9. Paragraph 5A provides:
A. Sublicensee shall, within sixty (60) days from the date of the issuance of this Sublicense, submit to Drywood suitable documentation to Drywood's satisfaction irrevocably guaranteeing financing for the construction of one unit (as defined hereinabove) and shall cause commencement and completion of construction of the unit within twelve (12) months from the date hereof. Sublicensee shall diligently pursue the expeditious completion of the unit and the installation and operation of the Chamber. Within twenty-four (24) months from date hereof, Sublicensee shall have completed the ten (10) unit Facility referred to in paragraph 1 above.

10. Paragraph 12A of the sublicense provides:
A. In the event of default by Sublicensee (or its assignee) in any of the terms or conditions of this Sublicense, and the failure to cure same on thirty (30) days written notice and demand by Drywood then, in addition to all other rights and remedies it may have under law and equity, Drywood may terminate its Sublicense; provided that if more

than thirty (30) days is required to cure a default (other than payment of monies), then the default shall be deemed cured if Sublicensee commences to cure same within thirty (30) days and diligently pursues same to completion. An election by Drywood of one remedy shall not constitute a waiver of any other remedies which it may thereafter exercise.

11. Paragraph 1 of the amendment to the sublicense makes IWP's obligation to perform contingent upon Drywood/PDI's prior performance of one of three conditions. Paragraph 1 provides:
1. The 12-month period referred to in paragraph 1(A) and 5(A) of the Sublicense shall commence the date that Drywood either (a) informs Sublicensee that it, Drywood, stands ready (which must be verifiable) to construct, or contract for the construction of said Chambers, (b) inform Sublicensee that it, Drywood, is unable for any reason to construct or to contract for construction of said Chambers, or (c) from the date that Drywood delivers, or notifies Sublicensee that it stands ready to deliver, all necessary documentation and know-how to Sublicensee so as to allow Sublicensee to construct or contract for the construction of said Chambers, whichever date first occurs....
PX 54.

tions in the amended sublicense,[12] there was sufficient evidence for the jury to conclude that defendants' undisputed refusal to provide technical information prevented plaintiff from obtaining appropriate financial documents. Where a party's performance is prevented by the other party to the contract, the first party's nonperformance is excused and does not constitute a breach. *See People of Porto Rico v. Title Guarantee & Surety Co.*, 227 U.S. 382 (1913); 6 Corbin, Contracts § 1264 (1962). The factual issue of defendants' frustration of plaintiff's performance was squarely put to the jury. The jury was entitled to conclude that irrevocable guarantees of financing for the new technology could not be obtained by plaintiff without adequate assurance of access to defendants' technical information and know-how. Thus, plaintiff's nonperformance was justifiably excused.

■ The jury might also have found that Drywood's notice to IWP (PX 88), which purported to activate the period for plaintiff's performance, was ineffective. The amendment to the sublicense made plaintiff's performance contingent on Drywood's performance of one of three conditions. *See* fn. 11, *supra*. Drywood apparently chose the first option, *see* PX 54 § 1(a), and informed plaintiff it stood ready to deliver RFV kilns. PX 88. In light of the uncontradicted evidence, neither Drywood nor any defendant was ready at that time to supply RFV kilns, *e.g.*, XVI at 23. The jury could conclude that Drywood's notice was not "verifiable," as required by the amended sublicense. PX 54 ¶ 1(a). Thus, the notice was ineffective and did not activate plaintiff's performance period.

■ Finally, the jury may have found that plaintiff secured adequate finance guarantees. There was evidence that John Dutton, who owned a business financing or "venture capital" company (XV at 6–7), had agreed to finance plaintiff's initial operation (XV at 13–18; PX 283). The evidence further showed that plaintiff informed defendants that it had secured financing (PX 93; 99; 100; 102; 104; 105). Viewing all the evidence, in addition to defendants' failure to provide any notice of default, the evidence supports the jury's finding that plaintiff provided adequate guarantees of financing.

■ There is no dispute that defendants did not provide plaintiff with updated technical information and know-how. Their second contention, however, is that the sublicense did not require them to furnish such information. We determined, after viewing the contract as a whole, that the contract was ambiguous on the issue of whether Drywood (and its assignee PDI) was obligated to furnish updated technical information on a continuing basis. Accordingly, the issue was presented to the jury which reasonably found that defendants were obligated under the sublicense to provide such information and had breached the contract by failing to do so. Resolving ambiguities in contracts is particularly within the jury's province as fact-finder, and defendants have presented no argument which persuades us that the jury's conclusion is at all unreasonable in light of the contract itself and the circumstances in which it was made.

■ We note that defendants also claim that there is insufficient evidence of damages on the claim for breach of contract. Defendants' argument on this point, however, does not differ from their attack on the award of antitrust damages, which was substantially larger. California law, which the parties do not dispute as controlling this issue, permits both established and unestablished businesses to recover where "the damages can be calculated with a reasonable certainty." *S. Jon Kreedman & Co. v. Meyer Bros. Parking-Western Corp.*, 58 Cal.App.3d 173, 130 Cal.Rptr. 41, 49 (1976). As we concluded in Part III–D, *supra*, the evidence of damages was not speculative and was sufficient for a jury to determine damages, whether for a breach

---

**12.** *See* footnote 11, *supra*.

of contract or market exclusion, with reasonable certainty.

In sum, there was sufficient evidence for the jury to conclude that defendants Drywood and PDI breached the sublicense, as amended, and caused ascertainable damages to plaintiff.

## V. INDUCING BREACH OF CONTRACT

In its third cause of action, plaintiff claimed that all defendants, excluding Drywood and PDI, induced the latter two defendants to breach plaintiff's sublicense. There is no dispute among the parties that California law applies to this claim.

■ Under California law, inducing breach of contract is a tort with five basic elements:

" (1) that a valid contract existed between the plaintiff and another party; (2) that the defendant had knowledge of the contract and intended to induce a breach thereof; (3) that the contract was breached; (4) as a proximate result of the defendant's wrongful or unjustified [unprivileged] conduct; (5) resulting in damage to the plaintiff. [Citations.]" *Abrams & Fox, Inc. v. Briney* (1974), 39 Cal.App.3d 604, 608, 114 Cal.Rptr. 328, 331 ....

*Mayes v. Sturdy Northern Sales, Inc.*, 91 Cal.App.3d 69, 154 Cal.Rptr. 43 (1979). *See also* Restatement (Second) of Torts, § 766 (1977).

■ The conduct by which a defendant induces the breach, or intentionally interferes with another's contract rights, may be "either by unlawful means or by means otherwise lawful when there is a lack of sufficient justification for such interference." *Abrams & Fox, Inc. v. Bri-*

ney, *supra*, 114 Cal.Rptr. at 606; *Imperial Ice Co. v. Rossier*, 18 Cal.2d 33, 112 P.2d 631, 632, 634 (1941). Moreover, when interference with performance is intended, the manner of interference is "not of great importance." W. Prosser, Handbook on the Law of Torts, § 129 at 936 (1971); Restatement (Second) of Torts, *supra*, § 766 comments c, k. Furthermore, an agent of the promissor may be liable for inducing a breach of contract where he misdirects or omits performance. W. Prosser, *supra*, at 935–36 n. 19.

■ A defendant may also be liable if he provides a party with an incentive to breach the contract. *Id.* at 934; *see also* Annot., Procuring Breach of Contract, 26 A.L.R.2d 1227, § 813 at 1251 (1952); Note, Inducing Breach of Contract, 36 Harv.L. Rev. 663 (1923). Furthermore, a defendant is not justified in inducing a breach of contract simply because he is in competition with one of the parties to the contract and seeks to further his own economic advantage at the expense of the other. *Imperial Ice Co. v. Rossier, supra*, 112 P.2d at 633.

■ We now turn to the facts of this case. We have previously held that the evidence was sufficient to find that the contract was breached and plaintiff was damaged. *See* Part IV, *supra*. Furthermore, there is no dispute that defendants knew of plaintiff's sublicense. In fact, the only element peculiar to the inducement to breach claim challenged by defendants is the requirement that defendants intended to induce the breach.[13]

■ Intent, referencing a state of mind, is generally proved through circumstantial evidence, and the jury may draw the infer-

---

**13.** We note that defendants assert that "no party other than Power Dry (with its wholly-owned subsidiaries, Power Dry Patent and GWP, which were legally incapable of inducing any breach by Power Dry) participated in the decision in January 1982 to notify plaintiff of the invalidity of its purported contract." PDI et al. Brief in Support of Post-Trial Motions; *see also* Compton Post-Trial Brief at 3, ¶ 4; Crowley Post-Trial Brief at 20–21, ¶ 3. These arguments, even as-

suming they were true, are irrelevant to the contract issues because the gist of the contract claim is Drywood's and PDI's failure to provide technical information, prior to plaintiff's termination. Thus, it is defendants' conduct in providing encouragement, assistance and incentive to withhold technical information, not the termination letter, that provides the source of their liability on the contract and tort claims.

ence that a defendant intends the consequence of his knowing acts or conscious omissions. *See, e.g., United States v. Martinez,* 694 F.2d 71, 73–74 (5th Cir.1982); *United States v. Tidwell,* 559 F.2d 262, 264 (5th Cir.), *rehearing denied,* 564 F.2d 98 (5th Cir.1977), *cert. denied,* 435 U.S. 942, 98 S.Ct. 1520, 55 L.Ed.2d 538 (1978).

■ There was more here, however, than mere permissible inference. There was direct evidence that defendants knew plaintiff was entitled to technical information and that plaintiff had requested that information from Drywood and PDI. There was also evidence that EBC and Compton directed PDI to ignore plaintiff's request. Furthermore, the evidence showed that defendants actively facilitated the financing and transfer of the sublicense to PDI knowing that PDI would breach the sublicense. Each of the defendants derived substantial economic advantage from the financing in which the breach and termination of plaintiff's sublicense played a central role.

■ The assertion that defendants considered the sublicense invalid, *see, e.g.,* Compton's Post-Trial Brief at 3, ¶ 5, is not a defense where defendants knew the terms of an express contract. Restatement (Second) of Torts, *supra,* § 766 comment i.

■ Nor can Crowley shield himself from liability simply by asserting that he gave no legal opinion on the validity of the sublicense. Throughout the relevant period, Crowley was actively pursuing his financial interest on several fronts: (1) as a party who held essential patent interests and royalty rights; (2) as a shareholder in Drywood; (3) as general counsel, through AJCPC, to Drywood; and (4) as a major shareholder in AJCPC, with a security interest in Hronopoulos' patent interest. In his capacity as counsel to Drywood, Crowley directed Howard Blumenthal, an AJCPC employee, to notify various sublicensees that their licenses were terminated or "activated." PX 19; 41. Nonetheless, Crowley never advised Drywood, nor did he direct Blumenthal, to respond to plaintiff's numerous requests for technical information pursuant to the sublicense.

From the evidence, of which the foregoing is but a small portion, the jury could reasonably infer that defendants intended to induce Drywood's and PDI's breach.

### Punitive Damages

■ The jury awarded plaintiff punitive damages against EBC, Compton and Crowley for maliciously inducing a breach of contract. Intentionally inducing a breach of contract is an actionable tort. W. Prosser, *supra,* § 129 at 929. California Civil Code § 3294 (West 1970 & Supp.1984) provides for punitive damages in tort claims. The statute provides, in relevant part:

(a) In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.

\* \* \* \* \* \*

(c) As used in this section, the following definitions shall apply:

(1) "Malice" means conduct which is intended by the defendant to cause injury to the plaintiff or conduct which is carried on by the defendant with a conscious disregard of the rights or safety of others.

(2) "Oppression" means subjecting a person to cruel and unjust hardship in conscious disregard of that person's rights.

(3) "Fraud" means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury.

*See also Duff v. Engelberg,* 237 Cal.App.2d 505, 47 Cal.Rptr. 114, 116 (1965) (punitive damages may be awarded on claim for inducing breach of contract); Annot., *supra,* 26 A.L.R.2d at 1274–75.

■ Defendants contend that there was insufficient evidence of malice to award punitive damages. However, an award of punitive damages requires an examination of motive and intent, and the requisite "malice in fact" may be inferred from a defendant's conscious disregard of the plaintiff's rights. *Neal v. Farmers Insurance Exchange*, 21 Cal.3d 910, 148 Cal. Rptr. 389, 582 P.2d 980, 986 (1978); *see also Colonial Life & Acc. Ins. Co. v. Superior Court*, 31 Cal.3d 785, 183 Cal.Rptr. 810, 647 P.2d 86, 90 (1982); *Taylor v. Superior Court*, 24 Cal.3d 890, 157 Cal.Rptr. 693, 598 P.2d 854, 855–56 (1979). Defendant's state of mind may be proved by direct or indirect evidence from which the jury may draw inferences. *Neal v. Farmers Insurance Exchange, supra*, 582 P.2d at 987 n. 6; *Bertero v. National General Corp.*, 13 Cal.3d 43, 118 Cal.Rptr. 184, 529 P.2d 608, 625 (1974).

■ In brief, viewing the evidence in the light most favorable to plaintiff, the evidence showed that all three defendants discussed the terms of plaintiff's sublicense; all knew that plaintiff needed the technical information, and the license, to compete; all realized that plaintiff's license was a significant obstacle to their personal and corporate gain; all helped Drywood and PDI withhold information; and all facilitated the EBC financing knowing full well that, after the assignment from Drywood, PDI would breach plaintiff's license to their benefit.

The evidence is clearly sufficient for a jury reasonably to conclude that EBC, Compton and Crowley induced the breach in conscious disregard of plaintiff's rights.

Accordingly, we find no grounds to disturb the jury's award of punitive damages.

## VI. THE VERDICT

■ Defendants contend that a new trial is required because the jury awarded $900,000 in lost profits on the anti-trust claim and only $200,000 in damages on the breach of contract claim. Defendants argue that "the jury apparently considered only to [sic] [the] number of defendants

being punished under each count—$200,000 to be paid by two defendants, and $900,000 to be paid by nine defendants." PDI et al. Brief in Support of Post-Trial Motions at 22. The argument is frivolous speculation. Moreover, applying defendants' fanciful theory, the jury should also have returned a verdict for $700,000, instead of $200,000, on the claim for inducing breach of contract because seven defendants were found liable on that claim.

The only case cited for the proposition that different damage awards on different claims merits a new trial is *Weingart v. Allen & O'Hara, Inc.*, 654 F.2d 1096 (5th Cir.1981). In that case, the district court granted defendant's motion for judgment n.o.v., or, in the alternative, for a new trial on several independent grounds. Only one of the grounds "was that the jury's answers to the special interrogatories on damages were hopelessly inconsistent with the evidence and demonstrated that the answers were the result of confusion, sympathy and prejudice." *Id.* at 1105–06. After affirming on several grounds, the Fifth Circuit turned to the inconsistent verdict issue. In affirming, of course, the court applied an abuse of discretion standard. Without reference to the specific interrogatories, the court stated

that a new trial is required. The plaintiffs claimed the same damages on the same facts under their fraud theory as under their breach of contract theory, and the jury charges and the interrogatories on compensatory damages on each of those theories were identical and yet the jury awarded compensatory damages on each of those theories were identical and yet the jury awarded compensatory damages of only $28,000 for breach of contract and over $200,000 for fraud.

*Id.* at 1106. We find *Weingart* inapposite because, in that case, plaintiff apparently claimed identical harm under both claims.

In the instant case, however, plaintiff alleged, and the jury was charged, that the contract claim was based on defendants' failure to provide technical information. The antitrust claim, on the other hand, was

based on plaintiff's total exclusion from competition. The jury was entitled to conclude that the extent of the damages stemming from market exclusion was greater than that caused by the failure to provide updated technical information.

In *Aquachem Co. v. Olin Corp.,* 699 F.2d 516, 521 (11th Cir.1983), the court stated:

> [T]he Seventh Amendment demands that, if there is a view of the case which makes the jury's answers consistent, this Court must adopt that view. *Griffin v. Matherne,* 471 F.2d 911, 915 (5th Cir. 1973). It does not matter whether Aquachem can suggest equally plausible reasons for the verdict that would require reversal. *Miller v. Royal Netherlands, supra,* 508 F.2d at 1108. The test to be applied in reconciling apparent conflicts between the jury's answers is "whether the answers may fairly be said to represent a logical and probable decision on the relevant issues as submitted...."

And in *Malm v. United States Lines Co.,* 269 F.Supp. 731 (S.D.N.Y.) (emphasis added), *aff'd,* 378 F.2d 941 (2d Cir.1967), the court stated that "[i]nconsistent jury verdicts upon *different counts or claims* are not an anomaly in the law which at times recognizes a jury's right to an idiosyncratic position provided the challenged verdict is based upon the evidence and the law."

Applying this standard, we cannot say that the jury's different damages award on different claims, with correspondingly different injuries, is irreconcilable.

## VII. EVIDENTIARY RULINGS

### A. OLSEN'S IMMUNITY

■ Defendants contend that the court erred in granting plaintiff's motion *in limine* to exclude evidence that Olsen was given immunity to testify before a grand jury investigating allegedly illegal activities of Drywood and Hronopoulos. We excluded evidence of Olsen's immunity on the basis of Fed.R.Evd. 403 after finding the attenuated probative value of the proffered evidence was substantially outweighed by the danger of unfair prejudice and waste of time on collateral issues.

Defendants argue that "the grant of immunity to Olsen was ... a critically important probative link" in their defense that the sublicense was void as against public policy because it was given in return for favorable testimony before the grand jury.

The probative value of the evidence is, at best, slight. Moreover, the grant of immunity runs counter to defendants' claim that Olsen traded his testimony for the sublicense. Immunity was pointless if he had agreed not to testify, and immunity would not have been given, in all likelihood, if Olsen were not going to testify favorably.

In any event, defendants had ample opportunity to support their theory by showing the difference in Olsen's testimony before and after he received the sublicense and amendment. Thus, defendants were not materially prejudiced by the exclusion.

We note that letters from the office of the United States Attorney, stating that the government considered Olsen free of criminal liability, were also excluded. This entire area raised collateral issues of dubious relevance and presented a serious danger of confusing the issues and causing inordinate delay. Moreover, the clear danger of unfair prejudice to plaintiff, by implicating Olsen in criminal activity, substantially outweighed its probative value, if any. Accordingly, the evidence was excluded. Fed.R.Evd. 403.

### B. MISCELLANEOUS DOCUMENTS

Defendants also object to the admission of the following plaintiff's exhibits: 73, 127, 232, 233, 277 and 288. We have once again reviewed the contents of these documents and their foundation. We conclude now, as we concluded previously after extensive argument, that these documents are admissible as business records, Fed.R. Evd. 803(6), and as statements by a co-conspirator or his agent, Fed.R.Evd. 801(d)(2)(E).

We also find PX 232 and 233—the Sapounakis memoranda—admissible for the

additional reason that they are statements of the declarant's state of mind. Fed.R. Evd. 803(3); *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 295–96, 12 S.Ct. 909, 912–13, 36 L.Ed. 706 (1892) (letter expressing state of mind reasonable to show conforming action of second party); *United States v. Moore*, 571 F.2d 76, 82 n. 3 (2d Cir.1978); *United States v. Pheaster*, 544 F.2d 353 (9th Cir.1976), *cert. denied sub nom. Inciso v. United States*, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977).

We do not find that these documents lack trustworthiness, *see* Fed.R.Evd. 803(6); beyond this, their weight and credibility were matters for the jury. In this context, we note that the jury was specifically instructed to give particularly careful scrutiny to the documents:

> Now, much of the evidence here consisted of business records and other writings. Most of these came in under what we call an exception to the hearsay rule. You heard the lawyers object many, many times in this case on the ground of hearsay. Hearsay is an out of court statement by a witness which is not subjected to cross examination. And in these business records that were admitted into evidence, there are many such out of court statements.
>
> Now, you may consider those statements, but you should use some caution and scrutinize them carefully before you rely on them, simply because they were not subjected to the lie detecting process of cross examination. (XIII at 13–14.)

■ The general policy of the Federal Rules of Evidence, and Rule 803(6) in particular, "favors the admission of evidence rather than its exclusion if it has any probative value at all," *In re Ollag Construction Equipment Corp.*, 665 F.2d 43, 46 (2d Cir.1981) (citation omitted), and the court has broad discretion in determining issues of admissibility, *e.g., United States v. Fendley*, 522 F.2d 181, 184 (5th Cir.1975). In an antitrust conspiracy suit, where there is rarely direct evidence of agreement and plaintiff must rely on reasonable inferences from indirect proof, the rules of evidence

should be liberally construed "to the end that the truth may be ascertained and proceedings justly determined." Fed.R.Evd. 102.

For the foregoing reasons, we find that the contested documents were properly admitted.

## VIII. JURY INSTRUCTIONS

Defendants contend that various errors in the charge require the grant of a new trial. We have carefully reviewed the charge, in light of the evidence, claims and arguments of counsel. *National Distillers & Chemical Corp. v. Brad's Machine Products, Inc.*, 666 F.2d 492, 497 (11th Cir.1982). We find that the charge, taken as a whole, "fairly and adequately state[s] the pertinent legal principles" raised by the evidence. *Hogg's Oyster Co. v. United States*, 676 F.2d 1015, 1019 (4th Cir.1982). *See also Johnson v. Bryant*, 671 F.2d 1276, 1280 (11th Cir.1982); *Glass Containers Corp. v. Miller Brewing Co.*, 643 F.2d 308, 312 (5th Cir.1981) (no duty to charge on issues "inferentially suggested by incidental evidence in the record").

Defendants contend that the court should have given PDI's request to charge No. 3 and Crowley's request Nos. 20 and 21 concerning the legality of patent monopolies. In the circumstances of this case, we ruled as a matter of law that the patent defense did not apply, *see* Part III–A, *supra*. Therefore, the requests were not pertinent to any factual issue before the jury, and, moreover, would have been confusing and misleading. *See Harrington v. United States, supra*, 504 F.2d at 1317.

We reach a similar conclusion with respect to PDI's request Nos. 7, 8, 9 and 10. These requests concerned defendants' argument that the sublicense was invalid as an "insider contract" and lacked consideration.

■ We held the insider contract defense insufficient as a matter of law. The sublicense was "ratified and confirmed" in an agreement which incorporated the sublicense in an amendment to the sublicense.

The amended sublicense was executed by Olsen and Drywood (PX 54). It is undisputed that when Olsen executed the contract, he was no longer an officer or employee of Drywood. As a matter of law, therefore, the sublicense is not invalid as a contract between a corporation and an officer. *See* Del.Code Ann. tit. 8 § 144(a) (1983).[14]

Moreover, the original sublicense was executed by Hronopoulos as president of Drywood. Hronopoulos was also a 90% shareholder at the time. Obviously, he knew the terms of the sublicense and that Olsen was an officer of Drywood. Therefore, even the original sublicense is valid under Del. Code Ann. tit. 8 §§ 144(a)(1) and 144(a)(2).

Defendants' contention that the sublicense lacked consideration was also insufficient as a matter of law. By its own terms, the contract gives Olsen substantial rights to market the RFV process. In exchange, Olsen undertakes to construct or buy kilns, market them, pay royalties, and exchange technical information concerning the RFV process (PX 53). These provisions constitute the bargained-for exchange which is the essence of consideration. Cal.Civil Code § 1605 (West 1970 & Supp.); *In re Estate of Bray*, 230 Cal.App.2d 136, 40 Cal.Rptr. 750, 753 (1964). Therefore, defendants' requests to charge on the issue of consideration (PDI's Nos. 8, 9 and 10) were irrelevant to any issue before the jury.

Defendants also argue that the court erred by failing to give PDI's request Nos. 12A and 29 and Crowley's request No. 22. In essence, these instructions state that "an ambiguity in a contract must be construed most strongly against the party which wrote the contract." PDI request No. 12A.

■ To the extent that this statement constitutes a rule of interpretation, the courts do not apply it mechanically, especially where there is no evidence of adhesion or unequal bargaining advantage. In such circumstances, the rule is inapposite. *See, e.g., Schering Corp. v. Home Insurance Co.*, 712 F.2d 4, 10 (2d Cir.1983); *Texaco, Inc. v. Rogow*, 150 Conn. 401, 190 A.2d 48 (1963) (lease dispute).

The case upon which defendants rely in their brief, *Distillers Distributing Corp. v. J.C. Millett Co.*, 310 F.2d 162, 164 (9th Cir.1962), is not to the contrary. In that case, the Ninth Circuit did not hold that ambiguous contracts must invariably be construed against the drafter. Rather, the court simply noted that the rule was "applicable" in that case because the record "did not contain sufficient evidence to resolve the interpretation of the contract as contended for by [defendant]."

■ In this case, the evidence was sufficient to support both sides' interpretations, and the issue was properly submitted to the jury without resort to purported rules in aid of construction. Moreover, the evidence showed that Olsen "drafted" the sublicense by selecting portions from prior sublicenses drafted by Drywood. Thus,

---

14. Del.Code tit. 8 § 144(a) (1983) provides:

(a) No contract or transaction between a corporation and 1 or more of its directors or officers, or between a corporation and any other corporation, partnership, association, or other organization in which 1 or more of its directors or officers are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the board or committee which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, if:

(1) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or

(2) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders; or

(3) The contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified, by the board of directors, a committee or the shareholders.

the contract was between an individual with no legal experience and a corporation fully familiar with highly similar, if not identical, contracts.

In these circumstances, PDI's request Nos. 12A and 29 and Crowley's No. 22, concerning the rule of construing contracts against the drafter, were inapplicable, confusing and misleading.

■■■ Defendants also argue that the jury should have been instructed that "affiliated companies which are not in competition with one another cannot conspire." PDI et al. Brief in Support of Post-Trial Motions at 30. Defendants cite *Call Carl, Inc. v. BP Oil Corp.*, 554 F.2d 623 (4th Cir.), *cert. denied*, 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed. 280 (1977), in support of their argument. In that case, however, involving a gasoline dealership termination, the court expressly stated that it did not consider the issue of whether affiliated companies can conspire because that aspect of the district court's ruling was not appealed. *Id.* at 628 n. 4. Thus, *Call Carl* is wholly inapposite and does not support defendants' contention.

Moreover, unlike this case, the only alleged conspirators in *Call Carl* were a parent and its wholly-owned subsidiary. It should also be noted that in *Call Carl* the court found that, despite the termination, there was "horizontal competition in the market from other sources." *Id.* In this case, however, plaintiff's termination completely eliminated horizontal competition in the market for RFV kilns.

In *Copperweld Corp. v. Independence Tube Corp.*, —— U.S. ——, 104 S.Ct. 2731, 81 L.Ed.2d 628, 52 U.S.L.W. 4821 (1984), the Supreme Court addressed the issue of "whether a parent and its wholly-owned subsidiary are capable of conspiring in violation of § 1 of the Sherman Act." *Id.* —— U.S. at ——, 104 S.Ct. at 2739–41. The Court held that a conspiracy based solely on the conduct of a parent and its wholly-owned subsidiary is not prohibited by § 1 of the Sherman Act. *Id.* —— U.S. at ——, 104 S.Ct. at 2745–46. However, the Court did "not consider under what circumstanc-

es, if any, a parent may be liable for conspiring with an affiliated corporation it does not completely own." *Id.* —— U.S. at ——, 104 S.Ct. at 2739–41.

■■■ Of greater relevance in the context of this case, however, is the fact that *Copperweld* unequivocally reaffirms the rule that affiliated corporations can be held liable for conspiring with unaffiliated companies or persons. *Id.* —— U.S. at ——, 104 S.Ct. at 2738 & nn. 8 & 9. This rule is directly applicable to this case because plaintiff alleged, and the jury reasonably found, that the scope and membership in the conspiracy went beyond an agreement solely between the affiliated companies. There was evidence that the affiliates conspired with non-affiliates, such as EBC, Drywood, Hronopoulos, C & C, and Crowley. Thus, the issue was not whether the affiliates conspired with themselves, but whether they conspired with other defendants as well. This issue falls squarely within the rule reaffirmed in *Copperweld, supra*, at —— U.S. at ——–——, 104 S.Ct. at 2738–46. Therefore, defendants' proposed instruction concerning conspiracy solely among affiliates was inapposite. Moreover, even if defendants' proposed instruction were a correct statement of law and relevant, the jury's finding that the affiliates conspired with non-affiliates would render the omission harmless error. Fed.R.Civ.P. 61.

In conclusion, we find that the charge, taken as a whole and in light of the pleadings and evidence, fairly and adequately instructs on the law applicable to the factual issues submitted to the jury. *Hogg's Oyster Co. v. United States, supra*, 676 F.2d at 1019.

## IX. MOTION FOR A NEW TRIAL

■■■ Defendants also move for a new trial, in the alternative to their motion for judgment n.o.v., on the grounds that the verdict is against the great weight of the evidence and represents a miscarriage of justice. *See Wyatt v. Interstate & Ocean Transport Co.*, 623 F.2d 888, 892

(4th Cir.1980). On this motion, we bear in mind that the grant of a new trial is addressed to the court's sound discretion and that the standard for granting a new trial is somewhat less stringent than that for granting a judgment n.o.v. *See, e.g., Bevevino v. Saydjari,* 574 F.2d 676, 684 (2d Cir.1978); *Aetna Cas. & Sur. Co. v. Yeatts,* 122 F.2d 350 (4th Cir.1941); 11 Wright & Miller, Federal Practice and Procedure § 2806 (1973 & Supp.). Nevertheless, we do not find that the verdicts are contrary to the clear weight of the evidence. *Cf. Williams v. City of Valdosta,* 689 F.2d 964, 973 (11th Cir.1982) (verdict must be "contrary to the great, and not merely the greater weight of the evidence").

At the heart of this case were the inferences to be drawn from the direct and circumstantial evidence. We have found the jury's inferences reasonable, *supra.* The possibility that contrary inferences might have been drawn does not warrant the grant of a new trial.

Furthermore, we find no support for the argument that the verdict somehow represents a miscarriage of justice. Nor do we find any evidence in the record, in the conduct of the participants at trial, or in our observation of the jury throughout the trial that suggests to us that the verdict was to any extent the result of passion or prejudice. In fact, plaintiff's presentation was notable for its absence of hyperbole.

Accordingly, we deny defendants' motions for a new trial.

## X. DECLARATORY AND INJUNCTIVE RELIEF

■ Plaintiff's fourth and fifth claims seek declaratory relief, pursuant to 28 U.S.C. § 2201, and injunctive relief, pursuant to 15 U.S.C. § 26. The fourth claims seeks a declaration of the parties' rights and duties under plaintiff's sublicense. The fifth claims seeks permanent injunctive relief requiring Drywood and/or PDI, in essence, to provide plaintiff with all existing and future technology related to the RFV process. We decline to grant the relief sought on these claims for the following reasons.[15]

### A. DECLARATORY RELIEF

■ It is well established that the grant of declaratory relief rests within the discretion of the trial court. *Public Service Comm'n of Utah v. Wycoff Co.,* 344 U.S. 237, 241, 73 S.Ct. 236, 239, 97 L.Ed. 291 (1952). In declining to grant declaratory relief in the case before us, we emphasize that a declaratory judgment would serve no useful purpose in clarifying or settling the legal relations of the parties. *Maryland Cas. Co. v. Rosen,* 445 F.2d 1012, 1014 (2d Cir.1971); *Maryland Cas. Co. v. Boyle Construction Co.,* 123 F.2d 558 (4th Cir.1941). The jury award has compensated plaintiff fully for its losses, and, as a result, there is no need for declaratory relief. Furthermore, to the extent that a declaratory judgment would have the effect of requiring defendants to fulfill their obligations under the Nonexclusive Sublicensing Agreement, we note that our reasons for denying injunctive relief apply in this context as well. *See* Part X–B, *infra.*

### B. INJUNCTIVE RELIEF

■ When a plaintiff in an antitrust action seeks both monetary damages and injunctive relief, as here, the plaintiff is first entitled to a jury trial on his legal claims. *Ohio-Sealy Mattress Mfg. Co. v.*

---

**15.** Defendants' claim for declaratory relief, PDI et al. Answer at 17–18, must also be denied. When ruling on equitable claims, the court is bound by the jury's relevant findings on the legal claims. *Florists' Nationwide Telephone Delivery Network v. Florists' Telegraph Delivery Ass'n,* 371 F.2d 263, 271 (7th Cir.1967). It would be wholly inconsistent with the jury's finding in this case to grant defendants PDI et al. the declaratory relief which they request. Moreover, granting declaratory relief would serve no useful purpose at this stage because the legal obligations of the parties have been clarified by the jury's resolution of the legal claims. *See Maryland Cas. Co. v. Rosen,* 445 F.2d 1012, 1014 (2d Cir.1971). Accordingly, we deny defendants' claim for declaratory relief.

*Sealy, Inc.,* 585 F.2d 821, 824 (7th Cir. 1978); *Florists' Nationwide Telephone Delivery Network v. Florists' Telegraph Delivery Ass'n,* 371 F.2d 263, 271 (7th Cir. 1967). The court is then bound by the jury verdict on its subsequent ruling on the equitable claims under the doctrine of collateral estoppel. *Florists' Nationwide Telephone Delivery Network, supra,* 371 F.2d at 271. As a result, our treatment of the equitable claims here must not be inconsistent with the jury's disposition of the issues presented to it. *Id.*

Nevertheless, we are not required to grant equitable relief simply because the jury awarded damages to plaintiff. Under 15 U.S.C. § 26, the court may grant equitable relief to remedy violations of the antitrust law "when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity." Accordingly, we must apply basic principles of equity in determining whether to grant the injunctive relief sought by plaintiff here. In this context, plaintiff is not entitled to equitable relief because its remedy at law is adequate. *Weiss v. York,* 548 F.Supp. 1048, 1057 (M.D.Pa.1982). As part of its theory of damages at trial, plaintiff asserted that defendants' unlawful conduct deprived it of future profits on sales of RFV kilns. Plaintiff then presented evidence from which the jury could make a reasonable estimate of its future lost profits over approximately the next ten years. Having awarded plaintiff $900,000, the jury clearly based its verdict to a considerable extent on this evidence.

Thus, plaintiff requested and received prospective damages. Under plaintiff's own theory of damages, it can suffer no further future harm once it has been compensated for the profits from the sales it claims it would have made absent defendants' unlawful conduct. Its remedy at law is therefore adequate. Injunctive relief would afford a double recovery because plaintiff would receive an opportunity to earn the profits it has already been awarded by the jury. *Affiliated Capital Corp.*

*v. City of Houston,* 519 F.Supp. 991, 1011 (S.D.Tex.1981), *rev'd on other grounds,* 700 F.2d 226 (5th Cir.), *rehearing granted,* 714 F.2d 25 (5th Cir.1983). In essence, plaintiff has elected to pursue a full damage remedy, and injunctive relief would result in an unjust windfall. *Id.* Moreover, such injunctive relief, in the context of this case, would be analogous to an award of damages for breach of contract *and* specific performance as well. In order to avoid an inequitable result, we conclude that injunctive relief is inappropriate.

## XI. CONCLUSION

Accordingly:

(1) defendants' motions for judgment n.o.v. or for a new trial are denied in all respects;

(2) defendant PDI et al.'s counterclaim for declaratory relief is denied in all respects; and

(3) plaintiff's claims for declaratory and injunctive relief are denied in all respects.

So ordered.