INTERNATIONAL WOOD PROCESSORS, a corporation, Appellee,

and

John C. Olsen, Plaintiff,

v.

POWER DRY, INC., a corporation, Power Dry Patent, Inc., a corporation, Drywood Corporation, a corporation, Compton & Cloer Lumber Company, a corporation, General Wood Processors, Inc., a corporation, European Banking Company, Limited, a United Kingdom Company, K.N. Hronopoulos, an individual, Delano Compton, an individual, Defendants,

and

Arthur J. Crowley, an individual, Appellant.

INTERNATIONAL WOOD PROCESSORS, a corporation, Appellee,

and

John C. Olsen, Plaintiff,

v.

POWER DRY, INC., a corporation, Power Dry Patent, Inc., a corporation, Compton & Cloer Lumber Company, a corporation, General Wood Processors, Inc., a corporation, Delano Compton, an individual, Appellants,

and

Drywood Corporation, a corporation, European Banking Company Limited, a United Kingdom Company, K.N. Hronopoulos, an individual, Arthur J. Crowley, an individual, Defendants.

INTERNATIONAL WOOD PROCESSORS, a corporation, Appellee,

and

John C. Olsen, Plaintiff,

v.

POWER DRY, INC., a corporation, Power Dry Patent, Inc., a corporation, Drywood Corporation, a corporation, Compton & Cloer Lumber Company, a

corporation, General Wood Processors, Inc., a corporation, K.N. Hronopoulos, an individual, Delano Compton, an individual, Arthur J. Crowley, an individual, Defendants,

and

European Banking Company Limited, a United Kingdom Company, Appellant.

INTERNATIONAL WOOD PRO-
CESSORS, a corporation,
Appellant,

and

John C. Olsen, Plaintiff,

v.

POWER DRY, INC., a corporation, Power Dry Patent, Inc., a corporation, Drywood Corporation, a corporation, Compton & Cloer Lumber Company, a corporation, General Wood Processors, Inc., a corporation, European Banking Company Limited, a United Kingdom Company, K.N. Hronopoulos, an individual, Delano Compton, an individual, Arthur J. Crowley, an individual, Appellees.

INTERNATIONAL WOOD PRO-
CESSORS, a corporation,
John C. Olsen, Appellees,

v.

EUROPEAN BANKING COMPANY LIMITED, a United Kingdom Company, Appellant,

and

Power Dry, Inc., a corporation, Power Dry Patent, Inc., a corporation, Drywood Corporation, a corporation, Compton & Cloer Lumber Company, a corporation, General Wood Processors, Inc., a corporation, K.N. Hronopoulos, an individual, Delano Compton, an individual, Arthur J. Crowley, an individual, Defendants.

INTERNATIONAL WOOD PRO-
CESSORS, a corporation,
John C. Olsen, Appellees,

v.

Arthur J. CROWLEY, an
individual, Appellant,

and

Power Dry, Inc., a corporation, Power Dry Patent, Inc., a corporation, Drywood Corporation, a corporation, Compton & Cloer Lumber Company, a corporation, General Wood Processors, Inc., a corporation, European Banking Company Limited, a United Kingdom Company, K.N. Hronopoulos, an individual, Delano Compton, an individual, Defendants.

Nos. 84–2003, 84–2023, 84–2024, 85–1057, 85–1110 and 85–1111.

United States Court of Appeals, Fourth Circuit.

Argued June 4, 1985.

Decided May 30, 1986.

Charles F. Campbell, Jennings L. Graves, Jr. (John R. Devlin, Jr.; William A. Coates, Love, Thornton, Arnold & Thomason, on brief); Eric A. Queen (Matthew Gluck, Fried, Frank, Harris, Shriver & Jacobson, John A. Chandler, Sutherland, Asbill & Brennan, Arthur J. Crowley, W. Paul Tobin, Arthur J. Crowley Professional Corp., Donald R. Mullins, on brief), for appellants/cross-appellees.

Dale E. Fredericks (Rebecca A. Hull, Sedgwick, Detert, Moran & Arnold, Julian W. Dority, Dority & Manning, on brief), for appellees/cross-appellants.

Before WIDENER and ERVIN, Circuit Judges, and HOFFMAN, Senior District Judge, Eastern District of Virginia, sitting by designation.

WIDENER, Circuit Judge:

These appeals arise out of the district court's disposition of a rather complicated antitrust case in which a jury, after having listened to the testimony of more than 20 witnesses and having considered more than 240 exhibits during the course of a three and one-half week trial, determined that nine defendants had violated § 1 of the Sherman Act by conspiring to restrain

trade or commerce. See 15 U.S.C. § 1. The jury also found that two defendants breached contractual duties owing to the plaintiff under state law and that each of the seven other defendants intentionally induced such breach. Of these seven defendants, the jury additionally found that three of the defendants acted with malice in inducing the breach. The jury awarded plaintiff $900,000 on the antitrust claim, $200,000 on the breach of contract claim, $200,000 on the inducement of breach claim, and assessed $70,000 in punitive damages against each of the three defendants it found had acted with malice. The parties agree that the $200,000 award for breach of contract is included in the $900,000 antitrust award. The clerk entered a $2,700,000 treble damage judgment against all of the defendants on the antitrust claim and entered judgment for $70,000 in punitive damages against each of the three defendants whom the jury found had acted with malice. Thereafter, seven of the original nine defendants moved in the alternative for judgment n.o.v. or a new trial. In a thorough opinion, the district court rejected both motions. See *International Wood Processors v. Power Dry, Inc.*, 593 F.Supp. 710 (D.S.C.1984).

Following the district court's disposition of the post-trial motions, the same seven defendants [1] took appeals to this court essentially challenging the judgment as it relates to the conspiracy claim and the breach of contract claim.[2] Having considered each of the contentions raised by the several defendants, we affirm the judgment of the district court.

The litigation arose out of the effort to commercialize a new process for drying wood. The plaintiff,[3] International Wood Processors (International) alleged that nine defendants combined and conspired in unreasonable restraint of trade or commerce to exclude it from competing in the development, production, and use of the patented process and machine for drying wood. As will be shown more fully below, plaintiff held a nonexclusive sublicense which enabled it to build, sell, and lease an unlimited number of these patented wood-drying machines without any territorial restrictions. It alleged in substance that pursuant to a conspiracy to eliminate actual and potential competition in the market for the patented wood-drying machine, the defendants agreed to terminate, and did terminate unlawfully, International's sublicense and thereby excluded it as a competitor in the market for the new process. Plaintiff additionally alleged that two defendants who were bound by the terms of the nonexclusive sublicense agreement breached the agreement and that the seven other defendants intentionally induced the breach. By special verdict, the jury specifically found that all of the defendants combined or conspired to violate the antitrust laws by agreeing to eliminate plaintiff as an actual or potential competitor in the relevant market of the new wood-drying process.

An understanding of this case requires brief discussion of relevant background in-

---

1. Plaintiff's complaint originally charged nine defendants with violating § 1 of the Sherman Act. 15 U.S.C. § 1. These defendants included Power Dry, Inc.; Power Dry Patent, Inc.; Drywood Corporation; Compton & Cloer Lumber Co.; General Wood Processors, Inc.; European Banking Company, Ltd. (Bank); K.N. Hronopoulos; Delano Compton; and Arthur J. Crowley. Of these nine defendants, Drywood and Hronopoulos did not appear in the action in South Carolina and they did not appeal the judgments that were entered against them. The seven remaining defendants appealed to this court. While the appeals were pending, defendant Bank and defendant Crowley settled all aspects of their litigation with International Wood Processors.

2. We should note at this point that the defendants contend that the evidence was insufficient to support the state contract claim for lost profits. Since this contention rests essentially on the question of the sufficiency of the evidence to support the antitrust damage award, we will consider the contract claim in the context of the broader antitrust conspiracy claim.

3. International originally filed this action as a co-plaintiff with John C. Olsen but the district court ruled that Olsen lacked standing and directed a verdict against him on all claims.

formation concerning the new wood-drying process, attempts to commercialize it, and financial investment in the process. We will set out the general background information first, leaving some facts for later discussion in our analysis.

### The Patent

In 1973, Edward Koppelman applied for a patent on a new machine for drying wood in radio frequency vacuum kilns (RFV kilns). The radio frequency vacuum process (RFV process) differs from conventional kiln drying in several respects. In a conventional kiln, lumber is stacked, with airspace between boards, in a large insulated room where the temperature and relative humidity are controlled. Air continually circulates in the kiln and picks up moisture from the wood. As the air becomes saturated with water, it is released through vents. Drier air is brought in and heated up and is then circulated around the wood. This process of drying continues until the wood is dry enough for commercial purposes. The RFV process, on the other hand, operates on much the same principle as a microwave oven. In an RFV kiln, moisture is removed from wood by passing radio frequency microwaves through wood in a large vacuum chamber. In the RFV kiln, the wood is packed so that it surrounds a center plate called a hot electrode. Radio frequency waves pass from the center plate through the wood to a negative plate on the outside of the wood. The radio waves heat the water in the wood and, as the temperature rises, the water evaporates into the chamber's atmosphere and is then extracted through a vacuum system. As compared to conventional kiln drying, the RFV process substantially reduces the time required to dry wood and this, in turn, results in lower energy costs. Although the jury heard testimony that the RFV process was superior to conventional drying in some respects and that the new process was particularly suited for the furniture industry, there was also testimony that the RFV process had many technical problems and that the process yielded wood which was not as well dried as in a conventional kiln.

While the patent application for the RFV kiln was pending, in 1974, Koppelman granted to the Drywood Corporation, a defendant below, an exclusive license to develop and use the RFV process throughout the world. The exclusive license also gave Drywood the exclusive right to sublicense others to develop and use the process. At the time Koppelman granted the exclusive license, K.N. Hronopoulos, a defendant below, was an officer, director, and the sole shareholder of Drywood. In 1976, Koppelman was granted the patent, and in 1978 he assigned all of his right, title and interest in the patent to Hronopoulos. Hronopoulos gave Arthur J. Crowley 50% interest in the patent and 10% of all Drywood shares. In 1979, Hronopoulos gave Crowley's law firm, Arthur J. Crowley Professional Corporation (Crowley Professional), a security interest in Hronopoulos' remaining 50% interest in the patent as collateral for legal fees earned by the firm and for future services for Drywood, totaling $536,000.

Between late 1978 and mid 1979, Drywood granted several nonexclusive sublicenses in an effort to raise capital.[4] In February 1979, Drywood issued John Olsen, an employee of the corporation, the nonexclusive sublicense which is at issue here. Thereafter, in accordance with the sublicense provisions which granted Olsen, or a company designated by him, the nonexclusive license, Olsen assigned it to International and gave notice of such to Drywood. At the time of the assignment, Olsen was president and majority shareholder of International as well as a Drywood employee. In May 1979, Olsen resigned his position at Drywood and, in August 1979, Olsen and Drywood entered into an agreement amending the February nonexclusive sublicense agreement. The amended sublicense ratified the earlier agreement in its

---

4. Drywood sublicensees included Inter-Fair Lumber Co., Delano Compton, Frequency Drying International, Ltd. (referred to as the Lang license), International Wood Processors, and Mark H. Lazarus (license # 1 and # 2).

entirety subject, however, to certain changes. The sublicense, as amended, conferred on International as assignee of Olsen broad powers to build, lease, and sell an unlimited number of RFV kilns anywhere in the world. The sublicense also provided for an exchange of technical information and know-how regarding the RFV process and kiln. It is not disputed that the International sublicense was the most extensive sublicense granted.

### Attempts to Commercialize the RFV Process

Notwithstanding the issuance of several sublicenses by Drywood, it was apparent in mid-1979 that substantial financial investment was required for the commercialization of the RFV process. In mid-1979, Theodore Roubanis, a business associate of Hronopoulos, introduced Hronopoulos to Neil R. Balfour, an executive of defendant European Banking Company, Ltd. (Bank), and they discussed the RFV process and the need for obtaining outside capital for its commercialization. Throughout the summer of 1979, the Bank investigated the possibility of putting together financial backing to support Drywood's efforts to commercialize the RFV process. Balfour flew to Pickens, South Carolina with Hronopoulos and Howard Blumenthal, an attorney with Crowley Professional, and there they observed tests of the RFV wood-drying process at Compton & Cloer Lumber Co. facilities. Defendant Delano Compton, president and majority shareholder of defendant Compton & Cloer and a sublicensee of Drywood, had acquired prototype RFV kilns from Drywood's Research and Development plant in Eugene, Oregon when Drywood was having financial difficulties. Although Balfour was impressed by the commercial potential of the RFV process itself, at that time he did not think the Bank should commit to any direct financial involvement since Drywood and Hronopoulos were the subjects of allegations of securities fraud and embezzlement and their reputations were therefore "highly questionable."

The Bank's position apparently changed, however, after Drywood and Compton & Cloer entered into a joint venture on October 12, 1979. Under the joint venture agreement, Drywood agreed to execute a sublicensing agreement in favor of the new joint venture and Compton & Cloer agreed to provide financing and management for commercialization of the RFV process and RFV kiln. The joint venture called General Wood Processors (General/Venture) entered into an agreement with Drywood entitled "Amended and Restated Sublicensing Agreement," wherein Drywood granted to General/Venture as "sublicensee" all of the remaining power Drywood had to issue sublicenses under its exclusive license and, simultaneously, Drywood relinquished its power to grant further sublicenses. The sublicensing agreement further provided that General/Venture would have "the same powers as Drywood to acquire, own, operate, manufacture, sell, use or lease an unlimited number of [RFV kilns] and/or facilities ... anywhere in the world." There is evidence that at the time the sublicensing agreement was executed, Roubanis, Hronopoulos, Blumenthal, and Crowley assured Compton that outstanding Drywood licenses would be acquired or otherwise nullified. The two patent owners Hronopoulos and Crowley consented in writing to Drywood's execution of the sublicensing agreement with General/Venture. Even though Balfour thought that too much had been given to Compton & Cloer, especially since Compton & Cloer emerged as a 50% owner and Compton became the joint venture's chief executive officer, Hronopoulos convinced Balfour that the Bank should concentrate on backing General/Venture financially to get commercialization of the RFV process on its way. The evidence shows that during the latter part of 1979, Balfour, Hronopoulos, Blumenthal, and Roubanis generally discussed potential Bank financing and that routinely during these meetings they discussed the outstanding licenses and the possibility of bringing the licenses together into one entity. Balfour indicated that he was concerned about the competition from all of

the outstanding licenses and was particularly concerned about the licenses granting international rights. The evidence shows that after General/Venture was formed, Hronopoulos, Blumenthal, and Roubanis discussed the possibility of combining the outstanding international licenses into one entity and that upon conversation with Balfour, Balfour agreed that it made good business sense to place the licenses under one umbrella and to finance the entity without competition. At trial, Balfour admitted further that he told Roubanis he (Balfour) would not invest in the venture unless he received assurances that the international licenses would be brought into a single entity.

Thereafter, at the request of Hronopoulos and upon the suggestion of Balfour, Roubanis entered into an agreement with Olsen whereby Roubanis agreed to purchase all the stock and assets of International for $165,000. In a letter to Olsen prepared by Blumenthal, a Crowley Professional attorney representing Drywood, Roubanis confirmed his agreement to purchase plaintiff's stock and assets, which assets of course included plaintiff's license, and indicated to Olsen that he was in the process of forming a "mother company" which, as he had previously told Olsen, would incorporate all of the licenses. He further confirmed that Olsen would receive 2½ of the capital stock of the new company.

Around November 1979, Roubanis discussed with Compton his purchase of the Olsen international license and mentioned that acquisition of the other remaining outstanding international license, apart from General/Venture's license, was one of the Bank's conditions for financing. When Roubanis explained to Compton that all of the international licenses would be consolidated into "Compton's entity" and that the Bank would finance the entity, Compton agreed that he would pay for the licenses Roubanis acquired. Thereafter, in December 1979, under the instruction of Hronopoulos and with the knowledge of Balfour, Roubanis entered into an agreement to purchase for $300,000 the remaining international license (Lang license) held by an outsider.

Roubanis, however, did not succeed in acquiring the plaintiff's license under the agreement he reached with Olsen. On January 23, 1980, Olsen wrote Roubanis and indicated that he was no longer contractually bound by their October purchase agreement since Roubanis had failed to satisfy conditions of that agreement. Despite Balfour's persistent concern over outstanding international licenses competing with the Bank financed entity, Hronopoulos and Roubanis were not concerned about Olsen's cancellation because Drywood had sent a notice to Olsen on January 21, 1980 stating that Olsen was in default of his sublicensing agreement. Olsen, however, immediately challenged the default notice, and Drywood, according to its counsel Blumenthal, did not attempt to force termination at that time.

During the first few months in 1980, General/Venture sought to obtain financing from sources not associated with the Bank. It entered into an agreement with Arthur Lipper, a financier who agreed to raise a certain amount of financing within a specific time period. When Lipper failed to produce investors, Crowley drafted the formal notice of cancellation of the Lipper contract and directed Compton's attorney on how to effect the cancellation. After the Lipper financing fell through in July 1980, Balfour at the Bank felt it was then in a position to work out a deal with General/Venture. Balfour flew to South Carolina to see Compton and from there they placed a call to Crowley in Los Angeles to reach an agreement on Bank financing. The parties agreed, as confirmed by a Telex from Balfour at the Bank to Crowley, that the Bank would loan $3,000,000 and, of this amount, $500,000 would be paid to Crowley Professional for legal fees owed by Drywood. During the conversation, Compton stated that as a condition for entering into an agreement with the Bank, only he and Crowley would negotiate with the Bank. The evidence shows that because Compton and Hronopoulos were not

on good terms, Crowley was instrumental in bringing the two factions of General/Venture together to close the Bank financing.

During the last few months of 1980, the Bank attempted to raise venture capital to finance the commercialization of the RFV process and RFV kiln and considered different options regarding which entity it should finance. There was sufficient evidence from which the jury could have concluded reasonably that the Bank's major concerns in extending financing was competition from the outstanding sublicenses issued by Drywood and insulation of the entity it financed from the legal problems surrounding Drywood and Hronopoulos. In January 1981, several people, including Crowley, Blumenthal, Hronopoulos, Compton, and Balfour, met in New York to discuss the Bank's proposed terms for financing.

At the two-day meeting, the parties discussed ways to alleviate the Bank's concerns. Regarding its concern over competition from existing licenses, the evidence shows that during the meeting there were discussions about terminating all competing licenses and consolidating all remaining rights under the RFV patent into an entity or entities which the Bank would finance. The plaintiff's sublicense was discussed specifically and Balfour indicated that he was very concerned about competition because it conferred on plaintiff broad international rights virtually coextensive with the rights contained in Drywood's exclusive license. The evidence shows that at the meeting it was discussed whether to purchase, cancel, renegotiate, or limit plaintiff's license. At that time, it was decided that Blumenthal, at the direction of Balfour, would draft a letter to plaintiff giving notice that the time periods in its license had been activated and that plaintiff would be required to perform its obligations thereunder. On behalf of Drywood and at the direction of Crowley, Blumenthal drafted a letter to plaintiff dated March 12, 1981 which stated that Crowley Professional was giving notice to International that Drywood, through General/Venture, stood ready to deliver "subatmospheric chambers," (that is, RFV kilns), and that all time periods for plaintiff's performance under the sublicense were thereby activated.[5] The letter further advised plaintiff to contact Compton at General/Venture in Easley, S.C. Since the letter effected the activation of time periods in the license, International could maintain the license only by submitting proof to Drywood within 60 days that it had obtained irrevocable financing for the construction of one RFV kiln. Thereafter, it could maintain the license only by construction of one RFV kiln within 12 months of the time period activation.

On April 6, 1981, in accordance with the sublicense provision requiring an exchange of technical information and know-how,[6]

5. International's amended nonexclusive sublicense contained a limitation in the grant clause which conditioned its rights under the license. It was required to acquire, own, and operate one RFV kiln within 12 months of the date Drywood either:

 (a) informs Sublicensee that it, Drywood, stands ready (which must be verifiable) to construct, or contract for the construction of [RFV kilns], (b) inform Sublicensee that it, Drywood, is unable for any reason to construct or to contract for construction of [RFV kilns], or (c) from the date that Drywood delivers, or notifies Sublicensee that it stands ready to deliver, all necessary documents and know-how to Sublicensee so as to allow Sublicensee to construct or contract for the construction of [RFV kilns], whichever date first occurs.

When Drywood sent plaintiff the letter notifying it that Drywood stood ready to deliver RFV kilns, plaintiff was required by the sublicense to submit to Drywood within 60 days of the notification "suitable documentation to Drywood's satisfaction irrevocably guaranteeing financing for the construction of one unit."

6. Plaintiff's sublicense specifically provided:

 7. TRADE SECRETS & KNOW–HOW

 A. Drywood shall make available, for the use of Sublicensee, all trade secrets and know-how that Drywood has relating to the construction and operation of the Facility and the apparatus and process encompassed within said patent insofar as they relate solely to the drying, seasoning and treating of lumber.

 B. Sublicensee shall forthwith give full information of, and convey to Drywood, any

plaintiff requested updated information regarding the process and equipment from Compton and separately informed Drywood that it would be able to give Drywood the required assurances of irrevocable financing as soon as it received the requested technical information from Compton. Neither Compton nor Drywood complied with plaintiff's request for information. Plaintiff thereafter wrote several letters during the next few months to the effect that it would be able to prove its irrevocable financing only upon receipt of the technical information from Drywood. It also wrote to Balfour at the Bank indicating that it would be interested in negotiating a possible sale of its sublicense. The Bank was not interested in the proposal and therefore sent no response to International.

*Financial Investment in the Process*

After plaintiff made its initial request for updated technical information, the Bank was involved in making complicated arrangements to finance the RFV process through a newly-formed corporate entity, Power Dry, Inc. (Power Dry), which would control the patent and licensing rights to the RFV process. Despite not having received a legal opinion concerning the validity of plaintiff's sublicense, the Bank believed that the sublicense was invalid at that stage and, accordingly, made a business decision to complete the loans. Several transactions and arrangements were required to close in May 1981. Defendant Power Dry, a Delaware corporation, was formed as were its two wholly-owned subsidiaries, defendants Power Dry Patent, Inc. (Patent) and General Wood Processors, Inc. (General/Corporation). General/Venture transferred its amended and restated sublicense to Power Dry, and Drywood assigned to Power Dry all of Drywood's rights and obligations, subject to all existing sublicenses granted under the original exclusive

and all trade secrets and know-how acquired by Sublicensee relating to the construction and operation of the Facility and the apparatus and process encompassed within said patent.

license. Power Dry then transferred a purportedly exclusive license to defendant, General/Corporation, which was limited to the United States. Hronopoulos transferred to Patent his remaining 50% interest in the patent, subject to Crowley Professional's security interest in such. As part of the $4,000,000 financed by the Bank, $500,000 was paid to Crowley Professional which released its security interest in Hronopoulos' patent interest.[7] Crowley additionally transferred 1% of his personal 50% interest in the patent for no consideration to Patent.

Upon closing of the transaction on May 29, 1981 Patent owned 51% of the patent, while Crowley retained the remaining 49% interest. Power Dry, the sole owner of Patent, possessed all of the rights and obligations that Drywood and General/Venture had under the original exclusive license. Compton received 46.5% of the shares in Power Dry and was named chairman of the board. The Bank and its investors received approximately 22% of the shares in Power Dry. Drywood received a 31.5% profit interest in Power Dry and would receive a 31.5% share of Power Dry upon payment of Drywood creditors. Power Dry retained Hronopoulos as a highly-paid consultant.

In November 1981, plaintiff wrote Power Dry indicating, as it had previously indicated to Drywood and Compton, that it had financing available and that it could not begin construction of RFV kilns until it had received the technical information and know-how from Power Dry. Plaintiff wrote Power Dry again in December 1981 stating that it had received no response to its numerous letters requesting technical information and indicating further that it was in the process of negotiating with subcontractors who would assist in building the RFV kilns. The evidence shows that

7. Of the $4,000,000 financed by the Bank, $3,000,000 was an outright loan ($500,000 of which was designated as a loan to Drywood for payment of Crowley Professional legal fees) and the remaining $1,000,000 went toward the purchase of Power Dry equity.

during late 1981 and early 1982 plaintiff was negotiating with several companies who were interested in purchasing RFV kilns. The evidence further shows that plaintiff quoted an RFV sales price of $300,000 to its potential customers and that this was substantially below the $600,000 sales price quoted by Power Dry.

On January 23, 1982, Power Dry, Patent and General/Corporation finally responded to plaintiff's numerous requests for technical information. An attorney representing all three of the Power Dry entities notified plaintiff that its license was terminated. Plaintiff thereafter filed suit in the Central District of California. The district judge sua sponte transferred the case to the District of South Carolina.

## I. The Conspiracy Claim

In this principal assignment of error on appeal, the defendants challenge the district court's refusal to grant a directed verdict, judgment n.o.v., or new trial on the § 1 conspiracy claim. The defendants argue that the evidence did not establish a § 1 conspiracy violation because: (1) Power Dry's decision to terminate plaintiff's license in order to obtain financing to commercialize the patent is protected activity that is immune from antitrust attack; (2) plaintiff's relevant product market definition that was narrowly drawn to include only RFV kilns did not reflect commercial realities of the trade and, therefore, the alleged anticompetitive effects should have been considered in the context of the larger product market of wood drying equipment; and (3) plaintiff failed to produce sufficient evidence to support a finding of antitrust injury and amount of injury.

### A. *Patent Immunity*

Although defendants do not concede that they conspired to eliminate plaintiff as a competitor in the RFV kiln market, they argue that even if Power Dry terminated plaintiff's license in furtherance of such a conspiracy, the termination nevertheless is exempt from antitrust scrutiny. In essence, the argument goes that Power Dry, as holder of the patent rights, could consult with investors, investment advisors, and other individuals who had interests in the patent and, collectively, they could decide to terminate plaintiff's license because such action would reinstate the lawful patent monopoly in favor of Power Dry. Defendants assert that in such a case the antitrust laws do not bar collective action since Power Dry did not conspire with a competitor or potential competitor of Power Dry in that the action taken solely benefitted the entity holding the patent rights so that it enabled Power Dry to obtain financing to commercialize the patented process. In other words, defendants claim that since their conduct did not threaten competition in areas other than those protected by the patent, the conduct was lawful under the patent laws which entitle a patentee to exact the full value of an invention. See *United States v. Studiengesellschaft Kohle, m.b.H.* 670 F.2d 1122, 1128 & n. 9 (D.C.Cir.1981). Defendants therefore contend that a patentee's conduct, including the termination of one of its licensees, violates the antitrust laws only if it threatens competition in areas that are not protected by the patent.

We think, however, the defendants misplace their reliance upon the fact that Power Dry was the only patentee at the time Power Dry canceled plaintiff's license. By asserting that the only relevant act regarding plaintiff's conspiracy claim was Power Dry's termination of plaintiff's license in January 1982, the defendants maintain that no conspiracy could have arisen prior to April 1981 when Power Dry received all of General/Venture's and Drywood's rights under the patent and effective control over the patent except for plaintiff's license. The defendants, by limiting the time period of the conspiracy, thus are able to assert that their conduct did not violate the antitrust laws because Power Dry did not conspire with a competitor and therefore did not accomplish an unlawful extension of the patent monopoly.

Notwithstanding defendants' assertions that Power Dry was the patentee and that it did not conspire with a competitor to

effect the termination of plaintiff's license, we believe that the defendants have ignored the evidence that shows they had conspired together to eliminate competition well before Power Dry received its patent rights in April 1981. The district court carefully considered the question of the sufficiency of the conspiracy evidence and we think that the court correctly determined that a jury reasonably could have found that all defendants were involved in an ongoing conspiracy to eliminate plaintiff from the market and that such a conspiracy predated the formation of Power Dry. See 593 F.Supp. at 720–21. The court specifically found, and we agree, that the termination letter was a culmination of the conspiracy. *Id.* at 720. Despite defendants' contention that the only act relevant to the conspiracy claim was Power Dry's termination of plaintiff's license, we agree with the district court which found that the defendants acted in furtherance of the conspiracy even before Power Dry obtained its patent rights in mid-1981. See *id.* In particular, the court found that the evidence was sufficient for a jury to reasonably conclude that the defendants effected the conspiracy by withholding technical information and know-how and by facilitating and financing a corporate reorganization with knowledge that the essential purpose of such was to secure a monopoly. *Id.* Furthermore, the evidence shows that the defendants acted to eliminate all competition in the RFV market. In addition to the termination of plaintiff's license in 1982, the evidence fairly shows that the defendants were aware that other outstanding licenses were acquired or terminated as part of the plan to eliminate competition. See *id.*

Accordingly, because the evidence shows the defendants acted in furtherance of the conspiracy well before Power Dry received its patent rights, we decline to hold that the collusive decision to terminate plaintiff's license nevertheless was immune from antitrust scrutiny solely because Power Dry, the newly-created entity that terminated the license, conspired only with noncompetitors. To the contrary, we must consider who the parties were who conspired to eliminate plaintiff as a competitor even before Power Dry received its patent rights.

Before we examine the participants in the ongoing conspiracy, however, it is not out of place to mention briefly the relation between the patent laws and the antitrust laws. The Constitution authorizes Congress to pass laws "[t]o promote the Progress of Science and the useful Arts, by securing for limited Times to ... Inventors the exclusive Right to their respective ... Discoveries." U.S. Const., art. I, § 8, cl. 8. Congress enacted the patent laws, see 35 U.S.C. § 1 *et seq.*, to stimulate invention and to reward innovation by granting a successful patentee the right to exclude others from making, using, and selling the invention for a period of seventeen years. 35 U.S.C. § 154. The statute further provides that the patentee may assign the patent or he may grant and convey exclusive rights under the patent. 35 U.S.C. § 261. Since patent law grants a patent holder the right to exclude others for a period of seventeen years, the property right thereby created is often referred to as either a limited or patent monopoly. See, *e.g., Mercoid Corp. v. Mid-Continent Investment Co.,* 320 U.S. 661, 665–66, 64 S.Ct. 268, 271, 88 L.Ed. 376 (1944); *United States v. Masonite Corp.,* 316 U.S. 265, 277, 62 S.Ct. 1070, 1077, 86 L.Ed. 1461 (1942); *Ethyl Gasoline Corp. v. United States,* 309 U.S. 436, 458–59, 60 S.Ct. 618, 626, 84 L.Ed. 852 (1940). Even though the patent statute does not describe a patent as a "monopoly," the exclusive rights granted to a patent holder permit exploitation of the patent free from competition for seventeen years and amount to no less however called. Thus, there may be conflict between the patent laws on the one hand, which encourage monopoly power by granting patent holders the right to exclude and be free from competition, and the antitrust laws, see 15 U.S.C. § 1 *et seq.,* on the other hand, which generally proscribe monopoly and encourage competition. See *generally* Kaplow, *The Patent-Antitrust Intersec-*

*tion: A Reappraisal,* 97 Harv.L.Rev. 1815 (1984); Sobel, *The Antitrust Interface With Patents and Innovation: Acquisition of Patents, Improvement Patents and Grant-Backs, Non-Use, Fraud On the Patent Office, Development of New Products and Joint Research,* 53 Antitrust L.J. 681 (1985); Turner, *The Patent System and Competitive Policy,* 44 N.Y.U.L.Rev. 450 (1969).

Despite the opportunities for conflict, the goals of the patent laws and the antitrust laws point toward the same end. While the patent laws provide the incentive for private enterprise to devote resources to innovative research and to make investments to develop the inventions, the public benefits from the entrance of a new product on the market and the increased competition which the new product will bring to the marketplace. See *SCM Corp. v. Xerox Corp.,* 645 F.2d 1195, 1203 (2d Cir.1981), *cert. denied,* 455 U.S. 1016, 102 S.Ct. 1708, 72 L.Ed.2d 132 (1982). The antitrust laws, on the other hand, were enacted specifically to protect competition in the marketplace. The fundamental premise is that the public benefits from a competitive economy that provides for efficient allocation of resources and increased production at lower prices. It is not difficult to conclude, therefore, that a central goal of both patent and antitrust law is the promotion of the public benefit through a competitive economy.

 Even though antitrust and patent laws were designed to achieve reciprocal goals, in certain situations methods employed under each body of law may conflict. As a general matter, if a patent holder enters into an agreement whereby he seeks to do more than that which is authorized by his limited monopoly, the agreement is subject to general law. See *Masonite Corp.,* 316 U.S. at 277, 62 S.Ct. at 1077. At this point, antitrust and patent law may not agree. When antitrust law is applied to a specific patent-related practice that apparently threatens competition in areas other than those protected by the exclusive grant, it is necessary for a court to weigh the potential anticompetitive effects of the practice against the risk that application of the antitrust laws will frustrate the purposes of the patent laws. See *Mannington Mills, Inc. v. Congoleum Industries, Inc.,* 610 F.2d 1059, 1070 (3d Cir. 1979); *see also Studiengesellschaft,* 670 F.2d at 1128. Keeping in mind that both antitrust and patent law are consistent with the theory that a competitive economy promotes lower prices, a court analyzing whether a particular patent-related practice unlawfully extends the limited monopoly should hesitate to apply antitrust sanctions to prohibit the practice if the effect of such would be to discourage innovation and investment by reducing potential rewards that otherwise would accrue to the patentee.

With these general principles in mind, we now consider whether § 1 proscribes the defendants' conduct as a conspiracy in unreasonable restraint of trade. Plaintiff alleged that in furtherance of a conspiracy to eliminate it as a competitor, the defendants (1) stripped Drywood of its only asset, the exclusive license under the patent which was subject to all outstanding sublicenses, (2) entered into various agreements causing all beneficial interest in the patent to be transferred to Power Dry, Patent, and General/Corporation, (3) purported to release Power Dry, Patent, and General/Corporation of all responsibilities for existing obligations of Drywood and Hronopoulos, and (4) eliminated competition from plaintiff by agreeing to terminate and then unlawfully terminating the sublicense Drywood had issued to plaintiff.

 We think that plaintiff has alleged and the evidence shows that defendants participated in an ongoing conspiracy to eliminate plaintiff as a competitor and that the conspiracy began to take shape in October 1979 around the time Drywood issued General/Venture the extensive sublicense. Drywood as licensor granted General/Venture effectively all of its rights under the exclusive license. It was clearly contemplated that Compton, who held a valid Drywood sublicense, would be able to obtain

financing because all competing licenses would be acquired or nullified. After General/Venture was formed, all outstanding licenses besides plaintiff's license were either acquired, terminated, or lapsed. When plaintiff's license could not be purchased, it was decided to send a letter to plaintiff to activate the time periods for performance in his sublicense. The evidence fairly shows that the defendants contemplated that this would have the effect of terminating plaintiff's license because Drywood and General/Venture (and later Power Dry) would not provide plaintiff with the technical information required by its license and which it needed to be able to conform to the terms of the license. After Drywood notified plaintiff of its time-period activation, neither Compton (at General/Venture) nor Drywood honored plaintiff's repeated requests for needed information it had a right to have. Thereafter, when Drywood, holder of the exclusive license, and General/Venture, licensee and competitor of plaintiff, conveyed all of their patent rights to Power Dry, Patent, and General/Corporation (collectively referred to as the "patent holder") to obtain Bank financing, the Power Dry entities refused to provide plaintiff with information.[8] It was only upon learning that plaintiff was marketing RFV kilns at a price ½ of Power Dry's price that the patent holder sent plaintiff an official termination letter.

Because we find that the evidence shows an ongoing conspiracy which predated Power Dry's formation and its obtaining of patent holder rights, we must consider the status of each defendant who participated in the conspiracy and determine whether his agreement to eliminate plaintiff as a competitor violated § 1. Although the status of the parties may have changed as their legal rights to the patent evolved, during the relevant time periods the members of the conspiracy included: Drywood as exclusive licensor: Compton as sublicensee and plaintiff's competitor; Drywood and Compton & Cloer joint venture (General/Venture) as successor to Compton's sublicense, successor to Drywood's exclusive sublicensing rights, and plaintiff's competitor; the Bank as the investment advisor and lender who recommended forming Power Dry, Patent, and General/Corporation for the purpose of holding the patent and licensing rights in controlled entities that would be financed by the Bank; and various other individuals and entities including Crowley, Compton, Hronopoulos, and Drywood who facilitated the financing of the new patent holder by relinquishing certain rights under the patent, thereby standing to gain substantial financial benefits if commercialization of the RFV process was successful.

While the defendants contend that, at most, Power Dry, the patent holder, terminated plaintiff's license in conjunction with individuals and entities who were not then competitors, evidence of the conspiracy shows that competitors early on agreed to eliminate competition. We think the evidence fairly shows that initially the exclusive licensor, Drywood, and a competing licensee, Compton, entered into a joint venture to commercialize the patent process, agreeing that all other competing licenses would be acquired or nullified. The joint venture, General/Venture, which consolidated the exclusive licensor's and a competing sublicensee's patent rights, needed financing and in order to obtain such, actively pursued the elimination of competition from outstanding licenses, including plaintiff. The joint venture and later Power Dry as patent holder and purported exclusive licensor attempted to remove plaintiff as a threat by refusing to give plaintiff

---

**8.** The jury found that Drywood and Power Dry, as assignee, breached the amended nonexclusive sublicensing agreement by failing to provide plaintiff technical information and, additionally, found that the seven other defendants induced the breach. The jury also specifically found that the Bank, Compton, and Crowley acted with malice in inducing the breach of the sublicensing agreement. On appeal, the defendants do not challenge the jury's findings regarding the validity of plaintiff's sublicense and the breach or the inducement of breach of that sublicense by the defendants. Instead, they challenge the jury's determination that plaintiff had actual damages in the amount of $200,000 that resulted from the breach of contract.

technical information required under its sublicensing agreement with Drywood.

Our review of the evidence leads us to conclude that from the time Drywood and Compton & Cloer formed General/Venture, which combined Drywood's exclusive sublicensing rights and Compton's sublicense with the intention of eliminating all other competing sublicenses, all defendants knowingly participated in an ongoing conspiracy to eliminate plaintiff as a competitor. Power Dry's termination of plaintiff's license was merely the culmination of an ongoing conspiracy which was marked at the outset by collusive anticompetitive conduct on the part of the licensor and a licensee to eliminate competition from all of the remaining licensees.

The defendants, however, rely on the rule that a patent holder has the right to exclude others from profiting from the patented invention, see *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 135, 89 S.Ct. 1562, 1582, 23 L.Ed.2d 129 (1969), and, as part of this right, the patent holder may refuse to grant licenses under the patent, see *United States v. Westinghouse Electric Corp.*, 648 F.2d 642, 647 (9th Cir.1981). The right to exclude does not permit the patent holder, who has acquired his rights under the patent as part of a conspiracy to eliminate outstanding licenses, to terminate such licenses in agreement with a former exclusive licensor, a former licensee, financial advisors, and other individuals with interests in the patent. Such an agreement, even over a period of time in which the status of the conspirators may change, constitutes an anticompetitive extension of the patent monopoly by an agreement to eliminate competition unlawful under the antitrust laws.

■ Where, as here, the principal exclusive licensor conspired with others holding the patent rights, financial advisors, and a licensee under the patent, to create a new corporate structure which would control the patent and licensing rights and would eliminate competition from all other uncontrolled licensees, the new patent holder endangered competition in the market for the patent by attempting to obtain from the licensees the lost right to exclude. We agree with the reasoning stated by the Third Circuit in *Mannington Mills, Inc. v. Congoleum Industries, Inc.*, 610 F.2d 1059 (3d Cir.1979), that when a patent holder initially places vertical restrictions on a licensee by contractually limiting the license in certain respects, in general the patent holder is entitled to exploit his patent monopoly by pursuing his own marketing strategy. On the other hand, however, a patentee's termination of a license in concert with a competing licensee, as here, is not entitled to an antitrust exemption. The patent system has no interest in permitting the patentee's monopoly to be used as a screen for the maintenance of a horizontal cartel at the licensee level. Furthermore, upon weighing the potential injury to competition against the risk that application of the antitrust laws would frustrate patent policy, we are of opinion that application of § 1 would encourage competition and would not pose a serious threat to patent policy. In particular, we do not believe that application of § 1 sanctions would discourage innovative activity by reducing potential rewards to the patentee. Surely a patentee does not contemplate that as part of his reward he will be able to grant and to revoke licenses at will, despite contractual obligation to the contrary, whenever his marketing strategy changes. Moreover, the patentee certainly does not reasonably contemplate that he may agree with one licensee and financial advisors that all other sublicenses should be eliminated.

Accordingly, since we find that application of § 1 to defendants' anticompetitive conduct would not frustrate patent policy, we conclude that the district court properly declined to exonerate defendants on the ground of patent immunity.

B. *Relevant Product Market*

The jury by special verdict found that the relevant product market for assessing the effects of defendants' anticompetitive conduct was the market for RFV kilns rather than the larger market of wood-drying equipment. Defendants maintain that

plaintiff failed to prove that RFV kilns constituted a separate product market since only ten RFV kilns had been sold in the United States and the product was not commercially acceptable.[9] In *United States v. E.I. DuPont & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956), the Supreme Court stated that in determining what constitutes a relevant market, "no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up" the relevant market. "A 'relevant market', then, is the narrowest market which is wide enough so that products from adjacent areas or from other producers in the same area cannot compete on substantial parity with those included in the market." L. Sullivan, *Handbook of the Law of Antitrust* § 12, at 41 (1977).

Defendants contend that since the relevant market inquiry requires assessing the interchangeability of products by consumers, the relevant market by definition requires consumers and a product already in the marketplace. The defendants maintain in effect that RFV kilns do not constitute a relevant product market because there were few established consumers of the product and because the kilns were commercially unacceptable. As a result, defendants assert that all wood-drying consumers necessarily used functionally interchangeable conventional kilns to dry their wood. Alternately, defendants contend that, even if RFV kilns are commercially acceptable, they should be included in the same market as conventional kilns which, unlike the RFV kiln market, is the economically significant market for wood-drying equipment. Of course, the finding of a larger relevant product market would affect the determination that defendants' anticompetitive conduct was an unreasonable restraint of trade since the anticompetitive effect of plaintiff's elimination from the larger market necessarily would have been less, given the fact that there was more competition in the wood-drying equipment market than in the RFV process market.

The district court considered the relevant market extension claim but concluded the evidence was sufficient to support the jury's finding that the RFV process constituted the relevant product market. 593 F.Supp. at 722, n. 6. The court concluded that on the basis of the expert testimony of witnesses who were knowledgeable in the wood-drying business and on the testimony of an economic expert, the evidence showed an absence of reasonable interchangeability between RFV and conventional kiln drying. The court then determined that the evidence showing an absence of reasonable interchangeability supported the jury's finding that the RFV process constituted the relevant product market.

The jury considered evidence that suggested the RFV process was superior to conventional kiln drying in speed and cost and in drying certain types of wood. The jury also heard testimony that the RFV process was neither technologically sound nor commercially viable. While defendants argue on appeal evidence that suggests the RFV kiln was reasonably interchangeable with a conventional kiln essentially because the RFV process was not yet commercially and technologically acceptable, the jury weighed the conflicting evidence and considered the credibility of the witnesses and concluded that there was no cross-elasticity of demand between the conventional and RFV processes despite the technological problems and the few sales of RFV kilns.

■ We have reviewed the evidence in light of the record as a whole and agree with the district court that plaintiff's evidence showing an absence of reasonable interchangeability supports the finding that the RFV process was the relevant product

---

**9.** Apparently, between October 1979 and April 1984, General/Venture and its successor Power Dry attempted to sell or lease RFV kilns and managed to make only 11 sales during that time period. Eight of the 11 units sold were purchased by one buyer and one of the 11 units was sold outside of the United States. Since the parties do not dispute that the relevant geographic market for determining the anticompetitive effects is the United States, we will refer only to those 10 units that were sold in the United States.

market. Since we find that substantial evidence supports the jury's finding on the relevant market issue and since we do not think that the verdict is against the clear weight of the evidence, we are of opinion the district court did not err in its determination of the relevant market.

### C. *Antitrust Injury or Damages*

■ Defendants contend on appeal that plaintiff failed to establish the fact of injury and that even if it did show it was injured in fact by defendants' § 1 violation, plaintiff nevertheless failed to prove damages that were capable of reasonable ascertainment. As an initial matter, we note that the fact of injury and the amount of damages are questions for the jury to decide, and it is therefore inappropriate for a reviewing court to substitute its judgment for that of the jury's if substantial evidence supports the jury's fact findings or if the verdict is not against the clear weight of the evidence. Whether reviewing the evidence under the standard used for a motion for judgment n.o.v., or the less limited review of a motion for a new trial, see *Wyatt v. Interstate and Ocean Transport Co.*, 623 F.2d 888, 891 (4th Cir.1980), we think the district court did not err in its refusal to disturb the verdict. See 593 F.Supp. at 718–19, 722–26.

■ We have considered the defendants' contentions with respect to the failure of proof of injury and find them to be without merit. Principal among their arguments is an attack on the testimony of plaintiff's expert in accounting and financial forecasting. The expert witness, one Markel, presented two financial forecasts to the jury based on assumptions concerning lost profits and a projected number of RFV kiln sales over a 10-year period. The district court adequately considered Markel's assumptions regarding price and prospective sales and concluded that a jury reasonably could have accepted Markel's projections. We agree with its conclusion.

■ An additional contention is that plaintiff did not prove that it was prepared to enter the RFV kiln business because it did not have the requisite financing. A certain Dutton had written to plaintiff stating as a condition for his financing that plaintiff would need to receive the most current design and technological information regarding the RFV process in accordance with the plaintiff's license agreement. Although plaintiff promptly requested the technical information required to secure financing, it fell on deaf ears. Neither Compton, Drywood nor Power Dry made any move toward honoring such request. We think the jury reasonably could have concluded that the failure to supply the technical information was a part of the conspiracy to eliminate plaintiff as a competitor and that they withheld the technical information in order to preclude the plaintiff from proving that it had adequate financing. We are thus of opinion the point made is completely without merit.

Defendants also attack Markel's financial forecast as unsupported by the record. We believe the district court properly admitted the evidence and properly found that the evidence supported the verdict. We especially note that, despite defendants' present attack on the reliability of the evidence, no expert witness was called to provide the jury with alternate opinions and conclusions.

To sum up, with the few additional remarks we have made, we affirm this aspect of the case for the reasons sufficiently stated by the district court in its opinion. 593 F.Supp. 710, esp. p. 722–26.

Finally, with regard to International Wood Processors' appeal on the issue of attorneys' fees, we affirm the decision of the district court, 593 F.Supp. 710, on that issue as well.

Accordingly, the judgment of the district court is

AFFIRMED.